Joshua Koltun (Bar No. 173040)
Attorney
1 Sansome Street
Suite 3500, No. 500
San Francisco, California  94104
Telephone:  415.680.3410
Facsimile:  866.462.5959
joshua@koltunattorney.com

Attorney for Defendant and Counterclaimant
Livingly Media, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

MICHAEL GRECCO PRODUCTIONS,) 
INC. d/b/a "Michael Grecco 
Photography," a California corporation,

            Plaintiff,

    v.

LIVINGLY MEDIA, INC., a Delaware 
Corporation; and DOES 1-10,

            Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 2:20-c-00151 DSF-PJW

REPLY MEMORANDUM OF LIVINGLY MEDIA, INC. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

*Hearing:*
Date: April 5, 2021
Time:  1:30 pm
Court: [Zoom Webinar]
Judge: The Hon. Dale S. Fischer

*Filed Herewith:*

Statement of Rebuttal Evidence
Memorandum of Objections and Responses to Objections
2nd Decl. of Joshua Koltun

Livingly Reply in Supp. Motion Summary Judgment                                            2:20-cv-00151 DSF-JC

Joshua Koltun ATTORNEY

# *TABLE OF CONTENTS*

## Contents

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 3

I.      Grecco has not raised a genuine issue as to whether Livingly's use of the Photographs was within the scope of the promotional license ............................................................... 3

    A. Grecco cannot sidestep Livingly's uncontroverted expert custom and practice evidence; that evidence is not "contrary to copyright law" ........................................................ 3

    B. It is uncontroverted that the Photographs were derivative works; Grecco has not raised a genuine issue as to whether he has a right to interfere with the promotional purpose for which they were created ....................................................................... 3

    C. Grecco has not raised a genuine issue as to whether the promotional license gave the Studios the right to allow any media that "came into possession" of these promotional Photographs to use them, as Livingly did, to illustrate articles about the shows ................. 4

    D. Grecco's contention that his 2019 Agreement with Fox did not involve a promotional license to Photographs 1, 2 and 3 is untenable; on the contrary, that Agreement expressly ratified the promotional license to those Photographs (over and over again.) .................................. 5

II.    Livingly's use of these promotional Photographs to illustrate their comments on the shows they depicted was fair use ....................................................................... 7

    A. The fair use doctrine is a flexible rule of equity; the Court is not required to countenance deceptive behavior ........................................................................... 7

    B. This Court is not required to make a value-judgement as to whether Livingly's Articles are sufficiently highbrow to qualify as "comment" under the fair use doctrine......................... 8

    C. That Livingly, like almost all media companies, makes advertising revenue from its articles, does not weigh against fair use. ............................................................... 8

    D. For the second factor, the issue is not whether the Photographs have sufficient "originality" to qualify for copyright protection, but rather where these promotional photographs fall on the spectrum between "factual" and "creative" photographs. ............................................. 9

    E. Grecco has provided no evidence that there is any "customary" market for licensing promotional photographs to the media commenting on the shows the photographs depict ..................................................................................... 10

III.    Grecco has introduced no evidence to support his contention that the statute of limitations should be tolled .............................................................................. 10

- i -

IV.    Livingly's authors reasonably believed that they were not infringing by using these promotional photographs to illustrate the shows they depicted; assuming liability this Court has discretion to award only minimal statutory damages ..........................................................11

CONCLUSION.................................................................................................................12

Joshua Koltun ATTORNEY

# TABLE OF AUTHORITIES

**Cases**

*Bourne v. Walt Disney Co.*, 68 F.3d 621, 630-31 (2d Cir. 1995 ......................................5

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994). ..............................8

*Effects Assocs. v. Cohen,* 908 F.2d 555, 558-9 (9th Cir 1990)...........................................3

*Ets-Hokin v. Sky*, , 225 F. 3d 1068, 1078 (9th Cir. 2000) ...................................................4

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 358, 362 (1991) ....................9

*Foad Consulting Grp., Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 825-28 (9th Cir. 2001).............................................................................................................................3

*Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1169 (N.D. Cal. 2019).........10

*Mavrix Photo, Inc. v. Rant Media Network,* 2020 U.S. Dist. LEXIS 248485, (C.D. Cal. Nov. 2, 2020)...................................................................................................................11

*Miniace v. Pac. Mar. Ass'n*, 2006 U.S. Dist. LEXIS 13726, at *8 (N.D. Cal., May 18)11

*Smith v. Barnesandnoble.com*, LLC, 839 F.3d 163, 166-68 (2d Cir. 2016) ....................5

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 447-50 (1984) ...........7

*Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir. 2014)...............9

*Toho Co., Ltd. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1217 (C.D. Cal. 1998). ..................................................................................................................................8, 9

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 38-41 (2d Cir. 2019).............................................................................................................................5

**Statutes**

17 USC § 203 ......................................................................................................................4

17 USC §304.......................................................................................................................4

17 USC §504.....................................................................................................................12


**Other Authorities**

Restatement 2d of Agency § 277......................................................................................11

Joshua Koltun ATTORNEY

Livingly Reply in Supp. Motion Summary Judgment                                        2:20-cv-00151 DSF-JC

*Joshua Koltun* ATTORNEY

## *INTRODUCTION*

For the most part, Grecco either does not dispute Livingly's facts, or "disputes" them without pointing to any contrary evidence, or with immaterial quibbles. The most salient "dispute" is whether the Photographs were promotional.

Grecco does not raise any material dispute as to the expert testimony showing the custom and practice in the industry concerning such promotional photos, or his own acts acquiescing in that practice. SS3, 4, 8-13, 44.

He does, however, purport to dispute that the Photographs were promotional, contrary to his binding 30(b)(6) testimony and prior representations he has made to this Court and other courts. SS 1, 37, 41. The basis for this dispute is his contention that the Photographs were never distributed to the media by the Studios.

But he can't get his story straight. One version of the story is a syllogism, premised on the equivocal testimony of Fox's Scott Whiteleather. The Studios (i) (so far as they can 20+ years later) ***never had access*** to the Photographs, (ii) ***therefore***, they ***could not*** have distributed them to the media. SDF 69, Opp. at 4:17-19; 5:19-22; 6:8-10; 7:3-8; 7:23-25; 14:13-23.

This syllogism is flatly contradicted, however, by the other version of the story. Grecco declares "[w]hile I initially provided copies of the Subject Photographs to Fox and MCA (respectively) to review in order for them to choose which photographs they wanted to use as Gallery Photographs, the Subject Photographs were not chosen by the studios and were returned to me." SDF37 (Grecco Decl., ¶ 7); Opp. at 3:25-26, 4:1-4.

In this version of the story, the proposition that the Studios did not distribute these promotional Photographs is premised on the Grecco's assumption that the studios returned the photographs and ***did not retain*** copies for their own promotional use. SDF 37. But the problem with that premise is that Grecco's dispute with Fox was ***precisely*** that Fox ***had*** retained photographs ***other*** than the 14 it had selected and had used these ***other*** photographs for uses that he contended were not permitted, such as "merchandising." SS 37, 42. The upshot of that dispute was the 2019 Agreement,

- 1 -

whereby the parties agreed that (i) Fox had purchased the copyright to the 14 photographs and (ii) Fox had a promotional license to all the *other* X-files Photographs Grecco had taken (including Photographs 1, 2, and 3). SS 43; *see section I.D*.

One must also keep in mind, when interpreting Grecco's declaration, the precise meaning Grecco is using when he discusses photographs. Grecco purports to see miniscule differences between two apparently identical photographs and opines that they are in fact "different." Grecco Decl. ¶¶ 1-6. His opinion is the basis for his statement that "at no point have I understood or agreed that either studio was in fact distributing the Subject Photographs to media," because, as he explains, he has "been aware that the studios have used other similar photographs from the same shoot." Decl., ¶¶ 3, 6, 8. In other words, the Studio may have circulated photographs that, to the lay person, were indistinguishable from the Photographs, but in Grecco's opinion those promotional photographs were really "different" Photographs. Grecco was not disclosed as an expert under Rule 26. 2nd Koltun Decl., ¶ 2.

Grecco's own summary adjudication motion, however, is premised on the proposition that any lay person (i.e. counsel, the Court), can tell just by looking at them that Livingly's Articles copied the [copyrighted] Photographs, because they "are not only substantially similar, they are the same." Grecco.MSA [DE 44] at 6:13-14; 6-9 (posture, hairstyles, positioning, etc.). But according to Grecco, two apparently indistinguishable photographs may in fact be "different." He can't have it both ways.[1]

The self-contradictory nature of Grecco's story does not raise a "dispute." On the contrary it renders the purported business records evidence supporting that story inadmissible. As that story falls, so do the arguments premised on it.

---

[1] See also SS 4. To be sure, Livingly admitted that it had copied the Photographs. Doniger Decl, Ex 13 [DE 44-15 (Request 6). But that was premised on precisely the sort of lay person's comparison presented to this Court by Grecco's counsel. If Grecco's testimony negating that premise is admitted, Livingly respectfully requests leave to withdraw that admission.

Joshua Koltun ATTORNEY

## *ARGUMENT*

**I.** **Grecco has not raised a genuine issue as to whether Livingly's use of the Photographs was within the scope of the promotional license**

**A.** **Grecco cannot sidestep Livingly's uncontroverted expert custom and practice evidence; that evidence is not "contrary to copyright law"**

Grecco tries to sidestep Livingly's uncontroverted expert evidence of entertainment industry custom and practice regarding  promotional photographs on the ground that it "conflicts with copyright law," namely that "an assignment of copyrights must be in writing, as does a right to sublicense."  Opp. at 7:11-15 (citing 17 USC § 204, *Effects Assocs. v. Cohen,* 908 F.2d 555, 558-9 (9th Cir 1990).

But Livingly is not relying upon the custom and practice testimony to show that Grecco assigned his copyrights.  As for Grecco's "rule" that a "right to sublicense" must be in writing, Grecco concedes, as he must, that it does not apply to nonexclusive licenses.  Opp. at 6:2-3 (citing *Effects,* 908 F.2d at 558).  A nonexclusive license can be shown by "nonwritten evidence--such as testimony, course of conduct, and custom and practice." *Foad Consulting Grp., Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 825-28 (9th Cir. 2001).   As explained below, that is the relevance here.

**B.** **It is uncontroverted that the Photographs were derivative works; Grecco has not raised a genuine issue as to whether he has a right to interfere with the promotional purpose for which they were created**

Grecco concedes that the Photographs are derivative works but denies that this has any relevance.  Livingly argued that Grecco cannot contravene the promotional purpose for which he was granted permission to create the Photographs.  MSJ, section I.A.  Grecco distinguishes Livingly's cases, saying that they "only address the distribution of derivative works beyond the scope of rights afforded by the copyright holder of the preexisting work."  Opp. at 5:5-10.  But that is precisely the purpose for which the evidence was introduced: to show the custom and practice in the industry where the Studio permitted a photographer to create promotional photographs of their television shows.  The permission the Studios granted Grecco to create these derivative

- 3 -

works is a **nonexclusive** license running **from** the Studios (the copyright holders) **to** Grecco, permitting him to create derivative works (the Photographs). Thus the permission need not be in writing, and custom and practice is helpful to establish what the permission was.[2] Moreover, to the extent that relevant written contracts exist, the custom and practice evidence is useful to interpret the meaning of terms such as "promotional"/"publicity" rights. SS 3, 4.

> ### C. *Grecco has not raised a genuine issue as to whether the promotional license gave the Studios the right to allow any media that "came into possession" of these promotional Photographs to use them, as Livingly did, to illustrate articles about the shows*

A key question presented by this case is the scope of the Studios promotional license. Grecco avoids presenting any evidence as to the scope of the promotional license, relying instead on an argument that, **whatever** the scope of the promotional license, it does not apply to the Photographs. But that assertion depends both on his self-contradictory and inadmissible factual contentions (discussed in the Introduction), and on his untenable interpretation of the 2019 Agreement (discussed in section I.D).

Importantly, the question of whether Livingly has a **sublicense** to the Photographs is dependent on a determination of the **scope** of the Studio's right to sublicense the Photographs. Livingly contends, and has presented uncontroverted expert testimony, that the custom and practice in the in the industry is that the studios would distribute promotional photographs as widely as possible to maximize publicity, in the hope and expectation that any media that "came into possession" of the

---

[2] *Ets-Hokin v. Sky*, relied upon by Grecco, turns on the determination that the underlying bottle photographed was not copyrightable. *Id.,* 225 F. 3d 1068, 1078 (9th Cir. 2000) It certainly does not stand, as Grecco suggests, for the proposition that the derivative work's copyright is independent of, and co-equal with, the copyright in the pre-existing work. That is the "new property" *(Rohauer)* theory expressly rejected in *Stewart v. Abend,* 495 U.S. 207, 221-36 (1990); Grecco's discussion of the derivative owners' rights after "termination" under 17 USC sections 203 and 304 is misplaced. Opp. at 2:27-3:15. Those sections create a statutory right to terminate licenses and tranfers after 35 years, which is inapplicable here.

Joshua Koltun ATTORNEY

photographs would use the photograph in editorial content discussing the show. SS 8-13, 44.  Grecco was specifically informed of this practice and had no objection.  SS 45.[3]

Thus, even if it were true, as Grecco contends, that the Studios never had the photographs, or never circulated them to the media, the custom and practice evidence shows that Livingly would nevertheless be permitted to use the photographs in the manner in which it did.  For ultimately it would not matter how the photographs came to be in Livingly's possession, since, as a media company, they were entitled to use them to illustrate editorial mentions of the shows.[4]

**D.    *Grecco's contention that his 2019 Agreement with Fox did not involve a promotional license to Photographs 1, 2 and 3 is untenable; on the contrary, that Agreement expressly ratified the promotional license to those Photographs (over and over again.)***

Grecco's opposition hinges on his interpretation of his 2019 Agreement with Fox.  According to Grecco, that Agreement only concerns "***fourteen other Gallery Photographs***, for which Fox had a ***nonexclusive license to exploit and advertise***," and does not apply to the Photographs.  Opp. at 6:10-12 (emphasis added), SDF 43.

That interpretation does not bear scrutiny.  The 2019 Agreement (Koltun Decl, Exh. 30, Exh. E thereto, *see* SS 43) relates to ***two different sets*** of photographs, as to

---

[3] Although the defendant has the burden of showing the existence of a license, the plaintiff has the burden of showing that the scope of the license was exceeded. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 630-31 (2d Cir. 1995). Plaintiff has the burden to prove a limitation on the licensee's right to sublicense. *Smith v. Barnesandnoble.com*, LLC, 839 F.3d 163, 166-68 (2d Cir. 2016) (license to distribute promotional samples and implied sublicense and sub-sublicense); *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 38-41 (2d Cir. 2019). However, since Grecco has presented no contrary evidence concerning the scope of the promotional license to the Studios, it doesn't matter whether the burden is on Livingly or on Grecco.

[4] To the extent that Grecco is relying on his declaration of his own "intentions" concerning the scope of any license to the Photographs, or, alternatively, protesting personal ignorance of the custom and practice in the industry, his reliance is irrelevant as a matter of law.  He is charged with that knowledge, and his [purported] private understanding is irrelevant. See MSJ at 13-14  nn. 8 , 9 (citing authorities).

Joshua Koltun ATTORNEY

which different terms apply. (In what follows, all emphasis is added). Grecco's *X files* photographs are defined as the "Gallery Photographs." *Id.*, p. 1. The "Gallery Photographs" are split into two subsets. One is the "***14 All Media Photographs***," which are the 14 Photographs that Fox selected in 1995. *Id.* The photographs that Fox did ***not*** select in 1995, and returned to Grecco, are referred to as the ***"Remaining Gallery Photographs."*** *Id. **These include Photographs 1, 2 and 3.*** SDF 36, 37.[5]

The parties agreed that Grecco ***had assigned the copyright*** to the 14 All Media Photographs. *Id.*, p.1, ¶¶ 2, 4.[6]

Fox had a license to "worldwide, non-exclusive, fully paid, perpetual, advertising and ***publicity*** use … of ***the Gallery Photographs***, including the right to ***sublicense*** the ***Gallery Photographs for advertising and publicity purposes."*** *Id.*, p.1. Again: Fox had "***non-exclusive*** [rights to] advertising and ***publicity*** use, in perpetuity in all media

[5]The 2017 dispute is significant. Grecco's contention that Fox has never "claimed that Grecco's business in some way 'harms' the promotional purpose of the Subject Photographs" is quite wrong (Opp. at 10-12). Fox sent Grecco a cease and desist letter in seeking to shut down his "licensing" (i.e. litigation) business. SS 42 (Koltun Decl., Exh. 28).

But Grecco had a card to play in that dispute. Fox had selected the 14 photographs in 1995 and, in Fox's view, purchased the copyright to those photographs. Grecco denied that the assignment was valid, and confronted Fox with the contention, for which he had evidence, that Fox had made "merchandising" and other uses of the photographs that had ***not*** been selected (i.e., the Remaining Gallery Photographs). SS 42.5 Thus, even if Fox had promotional rights to these Remaining Gallery Photographs, it had potential liability for those merchandising and other nonpromotional uses. In the 2019 Agreement, in addition to obtaining a ratification of its promotional (publicity) rights to all the photographs, Fox obtained a release of all of these previous "Questioned Uses" of the Gallery Photographs. 2019 Agreement, Koltun Decl., Exh. 30 (Exh. E thereto) at p. 1, ¶ 6 Significantly, the release included all of Fox's "affiliates" and so forth, *id.* and thus encompassed entities such as Delphi Internet Services, which had had provided its customers with "a database of downloadable *X-Files* photos." SS 38.

[6]Grecco assumes that if a photograph was returned to him in 1995, Fox did not retain a copy. That misstates the 1995 correspondence, in which Fox was selecting the 14 photographs for which it was ***purchasing the copyrights***, and thus had no reason to return them. It had promotional rights, however, in all X-files photographs Grecco had taken, for the reasons explained in this brief, thus was entitled to retain copies of all such photographs, and in any event Fox certainly believed that it had such rights.

- 6 -

now known or hereafter devised, throughout the world, of *the Gallery Photographs.*" *Id.* ¶ 1. Again, "for the avoidance of doubt," Fox's rights to the Remaining Gallery Photographs include "*all* advertising and *publicity* uses, including but not limited to *retrospective* advertising and publicity uses and *archival* advertising and publicity uses." ¶ 12. Thus the 2019 Agreement ratified and clarified (for all time) that Fox had a *promotional* license to all of Grecco's *X-files* photographs.[7]

## II. *Livingly's use of these promotional Photographs to illustrate its comments on the shows the Photographs depicted was fair use*

### A. *The fair use doctrine is a flexible rule of equity; the Court is not required to countenance deceptive behavior*

Grecco is asserting that if he took several photographs of Scully and Mulder in quick succession, and Photograph A was distributed by Fox to the media, he has a right to sue someone who used what appears to a layman to be Photograph A, based on his opinion that the Photograph is actually Photograph B, which was taken shortly before or after Photograph A. *See* Grecco Decl., ¶¶ 1-3, 7-9. The lawsuit will turn on Grecco's opinion that the defendant copied B, not A.

Assuming *arguendo* that the promotional license is not read to cover all all the photographs Grecco took in that photoshoot, that does not mean that the use of B is an infringement.

The fair use analysis doctrine is a flexible rule of equity. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 447-50 (1984); *Campbell v. Acuff-Rose*

---

[7] Thus the 2019 Agreement cannot be read as in any way limiting or terminating the promotional license to Photographs 1, 2 and 3. That Fox has (secretly) agreed that it will not intervene in Grecco's parallel efforts to license the photographs does not limit or terminate its own promotional license. Moreover, even if the 2009 agreement were interpreted as limiting or terminating Fox's promotional license, that cannot have had the effect of limiting or terminating any implied sublicense to a use that commenced prior to 2019, as did all of Livingly's uses. SS 33. *Smith*, 839 F.3d at 167-68 (termination of license to distribute promotional samples did not terminate ongoing right under the implied sublicense and sub-sublicense). This is true *a fortiori* given the secret nature of that agreement.

Joshua Koltun ATTORNEY

*Music, Inc.*, 510 U.S. 569, 577-78 (1994).  This Court need not countenance this deceptive business model.[8]  It does not serve the purposes of the copyright law to undermine the industry use of promotional photographs to promote copyrighted shows by allowing Grecco to generate endless uncertainty in this manner.  SS 18.

**B.   *This Court is not required to make a value-judgement as to whether Livingly's Articles are sufficiently highbrow to qualify as "comment" under the fair use doctrine***

Grecco pejoratively characterizes Livingly's articles as "vapid quizzes" and "'pop culture' listicle articles," which (he contends) "do not offer commentary, critique or news reporting."  Opp. at 9:13, 24-25.  But there is no real dispute that the articles ***do*** comment on the television shows that they depict.  That is precisely the purpose for which the photographs were created.  Grecco cites no authority for the proposition that this Court should make a value-judgment as to whether Livingly's "pop culture" comments are sufficiently highbrow to warrant the protection of the fair use doctrine.[9]

**C.   *That Livingly, like almost all media companies, makes advertising revenue from its articles, does not weigh against fair use.***

Grecco contends that since "Livingly's websites are commercial ventures designed to generate advertising dollars based on 'eyeballs,'" that weighs against fair use.  Grecco is mistaken.  The fact that Livingly, like most media companies, makes its revenue from advertising, is of little significance.  *Campbell*, 510 U.S. at 594 ("[i]t was error for the Court of Appeals to conclude that the commercial nature of [defendant's work] rendered it presumptively unfair").  "[A]lmost all newspapers, books and

---

[8] The term "copyright troll" is overused.  Defendants apply it indiscriminately. That pejorative term should be reserved for plaintiffs who, like the troll in the tale of the three billy goats, hides under a bridge, waiting for someone to innocently walk on the bridge, then pops out and demands to be paid a toll.  Plaintiffs like Michael Grecco.

[9] *Toho Co., Ltd. v. William Morrow & Co.*, relied upon by Grecco, is inapposite. *Id.* 33 F. Supp. 2d 1206, 1217 (C.D. Cal. 1998).  That case was brought by the movie studio that had created the Godzilla movies, against a book that was a compendium of photographs and detailed plot-summaries (which the Court determined to be copyrighted materials).  The Court specifically noted that if the proportion of comment had been greater, the book might have been protected by fair use.  *Id.*

- 8 -

Joshua Koltun ATTORNEY

magazines are published by commercial enterprises that seek a profit," but that is of little significance where "the link between [the defendant]'s commercial gain and its copying is . . . attenuated." *Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir. 2014) (internal citation omitted).

Here, for the most part, the connection between Livingly's revenue and the Photographs is highly attenuated, because the reader would have already clicked on the article, and turned to the relevant page discussing the show, before she would have encountered the Photograph.[10]

**D.      *For the second factor, the issue is not whether the Photographs have sufficient "originality" to qualify for copyright protection, but rather where these promotional photographs fall on the spectrum between "factual" and "creative" photographs.***

For the second factor, Grecco cites a number of cases that only stand for the proposition that a photograph meets the threshold of "originality" to qualify for copyright protection.  Opp. at 10:11-18.  The "originality requirement is not particularly stringent" – it only requires a "modicum of creativity."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 358, 362 (1991).

The question here is not whether Grecco's photographs meet that low threshold. The issue for the second factor is where these Photographs are on the spectrum from "factual" to purely creative.  See MSJ at 20:16-21.  The Photographs are of actors in their roles as characters on television shows.  Although these characters/shows are fictional creations, they are the creations of the Studios, not of Grecco.  The Photographs are more like factual photographs than purely creative ones.

---

[10]The exception to the description above is Photograph 3, which was a thumbnail (miniature) photograph that the reader would have encountered before deciding whether to read the article (a putative personality quiz based on the traits of Mulder vs. Scully).  Nevertheless, the proposition that the photograph would have been the primary motivator to click on the article itself is dubious.

Again, *Toho Co.* is inapposite.  *Id.* 33 F. Supp. 2d at 1217.  That case involved a book that consisted overwhelmingly of plaintiff's copyrighted material, and the revenue arose directly from the sale of the book to people who wanted to purchase that material.

- 9 -

Joshua Koltun ATTORNEY

### E.   Grecco has provided no evidence that there is any "customary" market for licensing promotional photographs to the media commenting on the shows the photographs depict

Grecco makes numerous references to "the customary price," "uses for which licensing fees are customary," "the licensing market and to Michael Grecco's business which he has built over the past thirty years," and so forth. Opp. 9:5, 9:7-8, 11:19-21. But Grecco has introduced *no evidence* to show that there is a "customary market" in which media companies pay a fee to use promotional photographs in articles discussing the shows they depict.

It is not enough that Grecco has created a website in which he offers a two-year "editorial" license to the Photographs for $3372. SS 49. "The truth is out there" (as they say). No one has *ever* purchased one of those editorial licenses, or indeed paid *any* amount of money specifically for an editorial license to one of the Photographs. SS 50, 51.

### III.   Grecco has introduced no evidence to support his contention that the statute of limitations should be tolled

Grecco contends that the statute of limitations is tolled as to Photographs 1 and 3 because Livingly has presented "no evidence that [he] knew or could reasonably have known" of its use of the Photographs three years before he filed suit. Opp. at 12:10-15. But the case Grecco cites for the proposition that the burden is on Livingly actually holds that the burden is on Grecco. *Id.* at 13:23-26; *Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1169 (N.D. Cal. 2019).

Grecco states that he first learned of Livingly's use of the Photographs on December 24, 2019. Opp. at 13:14. This is obviously false. His lawyers sent Livingly a cease and desist letter regarding these articles in February and April, 2019, and it is undisputed that Livingly took the Photographs down in response. SS 58, 65. For purposes of the discovery rule, the knowledge of his agents and the reasonableness of their conduct is imputed to Grecco. *See, e.g., Miniace v. Pac. Mar. Ass'n*, 2006 U.S.

- 10 -

Dist. LEXIS 13726, at *8 (N.D. Cal., May 18); Restatement 2d of Agency § 277. Grecco submitted no evidence to show *when* his agents first learned of Livingly's use, let alone that they could not have reasonably done so earlier.[11]

## IV. *Livingly's authors reasonably believed that they were not infringing by using these promotional photographs to illustrate the shows they depicted; assuming liability, this Court has discretion to award only minimal statutory damages*

Assuming liability, Livingly has asked the Court to rule that it infringement was innocent and award minimal damages. Grecco has introduced no evidence of actual damages or lost profits, but Grecco contends that he has raised an issue of fact as to whether Livingly acted willfully or innocently. Opp at 14-15. He has not.

Grecco contends that Livingly's authors are unable to state where they obtained the photographs and "told a story (i.e. that it likely would have gotten the X-files images from the Fox website or social media pages) that is demonstrably false (Fox admits that it did not have the images at the time and had not made them available for promotional use)." Opp. At 14:21-25. But Livingly's authors specifically stated that they did *not* believe they had gotten the photographs from the Fox website but rather that they would have found them elsewhere and used them in the belief that they were promotional. Doniger Decl. Exh. 1. The fact that the Fox website only carries press kits for its current television shows does not indicate that it has withdrawn permission to use promotional photographs for its older shows. SDF 67, 68. Grecco's assertion that it is "demonstrably false" that Fox *ever* distributed these images is itself false, as explained above. Livingly's authors were not reckless – or even negligent -- in concluding that the photographs were promotional; indeed there is no genuine dispute

---

[11] For this reason, Grecco's cases are innapposite. Opp. at 13:26-14:9. In *Mavrix Photo, Inc. v. Rant Media Network,* the court declined to determine on a motion to dismiss whether it was unreasonable not to have discovered the infringement *prior to hiring* ImageRights. *Id.* 2020 U.S. Dist. LEXIS 248485, at *7-9 (C.D. Cal. Nov. 2, 2020). On this summary judgment motion, by contrast, Grecco hired Imagerights and, through his law firm, other search vendors, and has not submitted evidence as to when his agents/lawyers first learned of Livingly's infringement. SS 57-60.

that the photographs were promotional.  SS 1, 37.[12]

The issue whether the infringement was willful, innocent, or neither, is for the Court, and the amount of statutory damages to be awarded by the Court (within the respective ranges) is discretionary.  17 USC §504.  There is no genuine dispute that Livingly's infringement was innocent, and certainly that it was not willful.  Livingly respectfully requests that this Court determine that, if liability is shown, Livingly can be required to pay no more than minimal statutory damages.

### *CONCLUSION*

Because Grecco's only purported disputes with Livingly's evidence are self-contradictory, inadmissible, and premised on erroneous interpretations of relevant contracts and of the governing law, Livingly respectfully asks this Court to grant its motion.

Dated:  March 22, 2021                    _____\s_____
                                          Joshua Koltun
                                          Attorney for Defendant and
                                          Counterclaimant Livingly Media, Inc.

---

[12]Another putative basis for willfulness is the assertion that the authors' practices were "contrary to Livingly's own policies regarding use of photographs on its websites, all of which were implemented with the intention of preventing the current situation." Opp. at 15:13-21,  But while Grecco cites language in the policies that it contends support that contention, it ignores this one: "OKAY to use …Photo stills from movies and TV shows …Basically, any image that is used to promote a piece of media."  SDF 77 (Doniger Decl., Exh. 3, LIV00010, 12, 14.) These were policies that were changed over time.  At some point Livingly changed the policy to include: "Please pull imagery directly from the show, film, or band website (rather than Google) and please properly credit both the network/studio and any photographer that is listed." *Id.* (Liv00016). This change matches Livingly's conduct in response to Grecco's cease and desist letter. SS 61-65.

Joshua Koltun ATTORNEY