Joshua Koltun (Bar No. 173040)
Attorney
1 Sansome Street
Suite 3500, No. 500
San Francisco, California  94104
Telephone:  415.680.3410
Facsimile:  866.462.5959
joshua@koltunattorney.com

Attorney for Defendant and Counterclaimant
Livingly Media, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL GRECCO PRODUCTIONS, INC. d/b/a "Michael Grecco Photography," a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>LIVINGLY MEDIA, INC., a Delaware Corporation; and DOES 1-10,<br><br>Defendants. | Case No.: 2:20-c-00151 DSF-PJW<br><br>STATEMENT OF REBUTTAL EVIDENCE OF LIVINGLY MEDIA, INC. FOR SUMMARY JUDGMENT |

Joshua Koltun ATTORNEY

Pursuant to Federal Rules of Civil Procedure Rule 56, Local Rules 7-10 and 56-1, and the [Standing] Order Re: Motions for Summary Judgment of this Court, Defendant and Counterclaimant Livingly Media, Inc. submits this Statement of Rebuttal Evidence in support of its Motion for Summary Judgment filed herewith.

| *Livingly Proposed Fact* | *Grecco Dispute* | *Livingly Rebuttal* |
|---|---|---|
| 1. This case involves four promotional still photographs ("Photographs") for television shows.<br><br>Deposition of Plaintiff ("Depo.") (Koltun Decl., Exh A) 58:4-61:21<br><br>Koltun Decl., Exh. 18, ¶19, Exh. 19, ¶¶ 21, 24.<br><br>Counterclaim (D.E. 11); Answer to Counterclaim (D.E. 15), ¶ 8. | Disputed as to the characterization of the Photographs as "promotional still photographs for television shows," but otherwise undisputed. | Grecco cites no evidence to contradict his 30(b)(6) testimony or his representations to this Court (Exh. 18 & 19)that the Photographs *were* promotional.<br><br>Insofar as the "dispute" is in reliance on the factual representations elsewhere, or on Grecco's interpretation of the 2019 Agreement, see responses herein and in Livingly's Reply Brief.<br><br>[Objection: Rule 30(b)(6), Rule 37(c)(1) re contradicting 30(b)(6) testimony]. |

- 1 -

Joshua Koltun ATTORNEY

| | | |
|---|---|---|
| 8. The custom and practice in the entertainment industry at all relevant times was that promotional photographs were distributed to the media precisely so that they would be published in editorial content concerning the television show. Licata Decl., ¶¶ 8, 9, 11, 12, 15, 19, 24- 33. | See Plaintiffs evidentiary objections. For purposes of this motion, undisputed. | [See response to Evidentiary Objection] |
| 9. The custom and practice in the entertainment  industry at all relevant times was that promotional photographs would usually, but not always, be accompanied  by language affirmatively indicating that permission was granted to the media (not to a specific licensee) to use the photographs in editorial content relating to the television shows. Licata Decl., ¶¶ 8, 9, 28, Exhs. B, C, D, and E. Koltun Decl., Exh 29, 11.28.2017, Exhibit 3 thereto (TCF157-161) | See Plaintiffs evidentiary objections. For purposes of this motion, undisputed. | [See response to Evidentiary Objection] |

Joshua Koltun ATTORNEY

- 2 -

Joshua Koltun ATTORNEY

| | | |
|---|---|---|
| 10. The purpose of the permissions language was to encourage such use by the media; in the absence of such language the promotional purpose of the images was nevertheless understood in the industry.<br><br>Licata Decl., ¶¶ 8, 9, 28 | Disputed.  Licata states that the purpose "was to be published by the press" (not "the media").  And it is entirely speculative and lacking in foundation whas was understood "in the industry" absent permissions language.  See also Plaintiff's evidentiary objections. | There is no meaningful distinction between "press" and "media."<br><br>Insofar as Grecco is relying on the premise that a nonexclusive license must be in writing, the premise is incorrect as a matter of law. See Reply Brief, section I.A.<br><br>Licata is qualified as an expert to speak to the custom and practice in the industry and in particular to how both journalists and publicity professionals responded to the [undisputed] fact that permissions language was not always included on promotional photographs, particularly transparencies (slides).  See Fact 9 above.<br><br>See response to Evidentiary objections. |

Livingly Statement of Rebuttal                                                                 2:20-cv-00151 DSF-JC

| | | |
|---|---|---|
| 11. The custom and practice in the entertainment industry at all relevant times was that promotional photographs were circulated, for example via press kits and direct communications between publicists and journalists, as widely as possible; the aim was to maximize publicity for the show.<br><br>Licata Decl., ¶¶ 8, 9, 24, 25, 29-32 | See Plaintiffs evidentiary objections. For purposes of this motion, undisputed. | [Grecco has not made any Evidentiary Objections, so this Fact is undisputed] |

Joshua Koltun ATTORNEY

- 4 -

| | | |
|---|---|---|
| 12. The custom and practice in the entertainment industry at all relevant times was that access to photographs was not conditioned on the media giving favorable coverage to the show.<br><br>Licata Decl., ¶¶ 8, 9 26, 29, 32 | Disputed.<br><br>Koltun Decl., ¶ 2, Exh. A, Deposition of Michael Grecco, 183:4 -185:9 | Grecco is not qualified to testify as an expert on the custom and practice in the industry.  He was not disclosed as an expert under Rule 26.  2nd Koltun Decl., ¶ 2;  See also Grecco Statement of Disputed Facts 3 & 4 (Grecco … is not a promotional or publicity expert.")<br><br>Insofar as the testimony purports to state when "they" would give access to a magazine to "be allowed on set," (185:2-8), the testimony is contradicted by his testimony at 140:8-9: "Fox gives every magazine that covers their show permission" to shoot on set."<br>Evidentiary Objection. Lacks Foundation, Hearsay; Failure to Disclose Expert Opinion, contradicts 30(b)(6) testimony. |

Livingly Statement of Rebuttal                                                2:20-cv-00151 DSF-JC

Joshua Koltun ATTORNEY

| | | |
|---|---|---|
| 14. Fox has not retained copies of its old press kits, but X-Files press kits purchased on the memorabilia market include (i) Grecco's black and white promotional photographs with Fox's copyright notice and permissions language on the bottom, and (ii) color transparencies (slides) of Grecco photographs that sometimes have Fox's copyright notice and permissions language, sometimes only the Fox copyright notice, and sometimes bear no markings at all.<br><br>Koltun Decl., ¶¶ 6, 7<br>Licata Decl., ¶ 28 & Exhs. B, C, D, E. | Disputed. The Koltun declaration is entirely lacking in any explanation as to the "memorabilia market" where the alleged press kits were obtained, of any other basis to establish authenticity or foundation. The Licata declaration purports to "recognize that the [25 year old] X Files are authentic press kits, but provides no proper authentication.<br>This is especially so for the one press kit that purports to include Photograph 2. | Livingly concedes that Koltun's testimony, standing alone, is insufficient to authenticate. Combined with the testimony of Licata, who oversaw the publicity departments both at Fox and at NBC/Universal, was knowledgeable as to the manner in which the were assembled and who, and who indeed, was the author of one of the press kits, the cited evidence is sufficient to sufficient to support a finding that the documents are authentic. F.R.E 901(a). Licata Decl., ¶13-15, 18, 27-32. |

| | | |
|---|---|---|
| 15. Among the Fox press kits that were located was one that contained Photograph 2.<br><br>Licata Decl., ¶ 28 & Exhs. B.<br><br>Koltun Decl., ¶ 6 & Exh. F. | Disputed. The Koltun declaration is entirely lacking in any explanation as to the "memorabilia market" where the alleged press kits were obtained, of any other basis to establish authenticity or foundation. The Licata declaration purports to "recognize that the [25 year old] X Files are authentic press kits, but provides no proper authentication.<br>This is especially so for the one press kit that purports to include Photograph 2.<br><br>Disputed that Subject Photograph 2 was contained in the press kit. Koltun Decl.  ¶¶ 2, Exh. A, (Exh. 26 and 32); 7.<br><br>Grecco Decl. ¶ 3. | Livingly concedes that Koltun's testimony, standing alone, is insufficient to authenticate. Combined with the testimony of Licata, who oversaw the publicity departments both at Fox and at NBC/Universal, was knowledgeable as to the manner in which the were assembled and who, and who indeed, was the author of one of the press kits, the cited evidence is sufficient to sufficient to support a finding that the documents are authentic. F.R.E 901(a). Licata Decl., ¶13-15, 18. 27-32.<br><br>On the issue of whether Photograph 2 was included, Livingly respectfully suggests that the Court examine Koltun Exh. F, which, for reasons stated in Koltun Decl. ¶ 6, is much clearer than the copy Mr. Grecco chose to examine).<br><br>Objection to Grecco Decl.: Lacks Foundation, Not Disclosed as Expert.<br><br>[See Evidentiary Objections and Responses] |

Joshua Koltun ATTORNEY

- 7 -

Joshua Koltun ATTORNEY

| 16. A copy of a Xena promotional photo purchased on the memorabilia market (not Photo 4), also carried permissions language that was addressed to the media generally, not to any specific licensee.<br><br>Licata Decl., ¶ 28, Exh. E<br>Koltun Decl., ¶ 6. | Disputed. The Koltun declaration is entirely lacking in any explanation as to the "memorabilia market" where the alleged press kits were obtained, of any other basis to establish authenticity or foundation. And assuming authenticity, the permission granted is "to reproduce the photo [not Photo 4] only for publicity or advertising purposes connected with the show depicted,"not for a listicle article about costumes.<br><br>Licata Decl., ¶ 28, Exh. E | Livingly concedes that Koltun's testimony, standing alone, is insufficient to authenticate. Combined with the testimony of Licata, who oversaw the publicity departments both at Fox and at NBC/Universal, and who ¶13-15, 18, and who indeed was the author of one of the press kits, is sufficient to sufficient to support a finding that the documents are authentic. F.R.E 901(a).<br><br>As to the suggestion that an article recommending that people dress up as Xena for Holloween is not good publicity for the show, see Licata Decl., ¶ 33. |
| 17. MCA used Photograph 4, among other things, as a cover for a boxed set of DVDs for the Xena series.<br><br>Koltun Decl., Exh. 24 | Disputed. A side by side comparison of the Subject Photograph 4 and the DVD box cover shows that the two images are different.<br><br>Koltun Decl. ,¶ 2, Exh. A (Exh. 23, GRECCO000005-6.<br><br>Grecco Decl. ,¶¶ 3, 6. | Objection to Grecco Decl.: Hearsay, Lacks Foundation, Not disclosed as Expert.<br>· |

- 8 -

| | | |
|---|---|---|
| 27. Although Grecco relies - and has historically relied -- upon his "assignment invoices" as the operative licenses, the documents that he produced in this action - and which were the basis of an earlier judicial decision -- are not, for the most part, documents that were actually sent to the Studios; rather these are invoices that Grecco sent to Hamilton, after the job was completed.<br><br>Depo. (Koltun Decl., Exh A) 79:2-7; 85:18-24; 127:7-130:3: 159:13 - 164:18<br>Assignment Invoices, Koltun Decl., Exh. 23 [GR003-007]<br>Grecco Interrogatory Response (Koltun Decl., Exh. B), Responses 1, 2, 3<br>Declaration of Grecco in *Everett* case (Koltun Decl., Exh 26), ¶¶ 1, 6, 7.<br>Assignment Invoices produced in *Everett* case, (Koltun Decl., Exh. 27) | Disputed as to the term "assignment invoice."<br><br>Disputed to the extent this statement suggests that the invoices Hamilton sent after a job was completed differed in terms from the estimate that was put together by Hamilton prior to the shoot.<br><br>Koltun Decl., Exh. A, Depo 130:4- 130:22. | Livingly in its briefing used the term "assignment invoice" as a shorthand to distinguish invoices sent after the assignment had been completed, as distinguished from the "estimates," which were sent prior to Grecco being engaged.  (See Koltun Decl., Exh. A (Depo at 78:4-7, 85:18:23, 129:3-5). Livingly agrees that it would have been better to use as shorthand the term "invoice," or "post-assignment invoice." Certainly Livingly did not mean "assignment" in the sense of copyright assignment (transfer).<br><br>Grecco himself testified that the invoices Hamilton sent the studios might well have differed materially from the terms on the invoices he sent her. Depo. 152:9-153:1.<br><br>Objection to Grecco testimony as to what "terms and conditions" Hamilton sent the studios: Contradicts 30(b)(6) testimony, Lacks Foundation, Best Evidence, Hearsay not Subject to Business Records Exception. |

Joshua Koltun ATTORNEY

- 9 -

| | | |
|---|---|---|
| 28.  Hamilton, in turn, would send a *different* assignment invoice to the Studio (or magazine).  The "usage" language on the face of those invoice would *not* necessarily match the language on the invoice from Grecco to Hamilton.<br><br>Depo. (Koltun Decl, Exh. A) 127:7- 129:5; 137:25-139:12; 151:18 - 153:1; 159:13 -164:18; Koltun Decl, Exh 23 Assignment Invoices produced in *Everett* case, (Koltun Decl., Exh. 27) | Disputed as to the term "assignment invoice."<br><br>Disputed to the extent this statement suggests that the invoices Hamilton sent after a job was completed differed in tenns from the estimate that was put together by Hamilton prior to the shoot.<br><br>Koltun Decl., Exh. A, Depo 130:4- 130:22. | [See Fact 28 re use of term "assignment invoice"]<br><br>Grecco himself testified that the invoices Hamilton sent the studios might well have differed materially from the terms on the invoices he sent her. Depo. 152:9-153:1.  *See also* 176:10-177:20.<br><br>Objection to Grecco testimony as to what "terms and conditions" Hamilton sent the studios: Contradicts 30(b)(6) testimony, Lacks Foundation, Best Evidence, Hearsay not Subject to Business Records Exception. |

Joshua Koltun ATTORNEY

- 10 -

| | | |
|---|---|---|
| 29. Indeed, in the one instance in which Grecco has a copy of the invoice that Hamilton sent to the Studio, the language on that invoice differs from the language on Grecco's invoice to Hamilton.<br><br>Depo. (Koltun Decl., Exh A); 127:7-130- 3; 159:13-164:18;<br>*Compare* Koltun Decl, Exh. 23 (Grecco00001) *with* Assignment Invoice produced in *Everett* case, (Koltun Decl., Exh. 27)[Doc 20-9 Page 20) | Undisputed, but disputed that the terms and conditions / license (as opposer to invoice) sent by Hamilton included materially different terms.<br><br>Koltun Decl., Exh. A, Depo 130:4- 130:22. | Grecco himself testified that the invoices Hamilton sent the studios might well have differed materially from the terms on the invoices he sent her. Koltun Decl., Exh. A 152:9-153:1.<br><br>Objection to Grecco testimony as to what "terms and conditions" Hamilton sent the studios: Contradicts 30(b)(6) testimony, Lacks Foundation, Best Evidence, Hearsay not Subject to Business Records Exception. |

- 11 -

Joshua Koltun ATTORNEY

| | | |
|---|---|---|
| 35.  In December 1994, Hamilton signed an agreement on Grecco's behalf with Fox ("1994 Agreement"). That agreement provided, among other things, that Grecco assigned "all right, title, and interest" in all the photographs he had taken of the *X-Files*, and agreed that Fox was "free in its sole discretion, without further compensation to you, (other than any compensation heretofore agreed to be paid to you by or on behalf of Delphi Internet Services) to utilize and exploit the [*X-Files*] Photographs worldwide, in perpetuity, in any manner it may deem appropriate, including without limitation, uses on or in connection with merchandising, commercial tie¶n, advertising, promotion, and literary publishing activities arising out of or related to 'THE X-FILES' television series."<br><br>Koltun Decl, Exhibit 28 (Exhibit C thereto, Grecco000498-409). Depo. (Koltun Decl., Exh A) 170:6- 172:11 | Disputed. Hamilton had no authority to sign the 1994 Agreement. Koltun Decl., ¶¶ 2, Exh. A, Exh. 18, Depo. (172:7-172:10, 177:8-177:11); 29; 31. | Hamilton had ostensible authority.  Grecco continued to use her as his agent until 2005, despite knowing in 1994 and 1995 that she had signed agreements on his behalf as to which he purportedly did not agree.  See Facts 36-40. |

Joshua Koltun ATTORNEY

| | | |
|---|---|---|
| 36. Sometime after signing the 1994 agreement and before June 29, 1995, Grecco delivered to Fox the photographs of all three *X-Files* shoots he had taken, including the 1993 and 1995 shoots at which Photographs 1 2 and 3 were taken, and including a 1994 shoot that is not at issue in this litigation.<br><br>Depo. (Koltun Decl., Exh A) 90:1-92:10; 147:8-14; 199:2-10<br>Koltun Decl., Exh. 30 (Exhibit E thereto TCF180) | Undisputed, except to the extent this suggests that Fox retained the Subject Photographs—the cited testimony makes clear that Fox returned the images it did not license for promotional use. *See also,* Koltun Decl. ¶¶ 2, Exh. A, (Exh. 26 and 32); 7. | The reference to Koltun Decl., ¶ 7 simply reiterates what Fox found in its 2017 search; to the extent that an inference can be drawn from the failure to find these photographs in 2017, that inference is negated by the undisputed portion of this Fact 36 , which is that Grecco *did* deliver the photographs.<br><br>[See also Dispute/Rebuttal/Obj. to Whiteleather Decl., Additional Material Fact 69 below.]<br><br>As to the purported dispute, the fact that the photographs were returned to Grecco does not indicate, one way or the other, whether Fox retained a copy.<br><br>Moreover, the suggestion that Fox must not have retained the photographs it did not return entirely misstates the context.  In the 1995 Agreement, Fox was purchasing an assignment of the copyrights to 14 pictures. Koltun Decl., Exh. 29, Exh. E thereto, TCF180-181).  Thus it would have been entirely consistent for Fox to *not* return the |

Joshua Koltun ATTORNEY

- 13 -

|  |  | photographs as to which Grecco no longer had any right, retaining a copy of those other photographs so that Fox could, at a minimum, continue to make promotional use of the photographs.<br><br>Even if it were true that Fox was **not** licensed to use the photographs that were returned for promotional use, Grecco specifically contended that Fox **had** continued to use photographs that were not returned.  See (Undisputed) Fact 42, and in particular see Exhibit 33, in which Grecco's counsel sent multiple examples of Fox having used photographs other than the 14 chosen by Fox (including Photograph 3, see "infringement 6 and 7, Cloth C[oats] Gillian Arms Crossed] (The 14 photographs are at the beginning of Exhibit 32.)<br><br>(Evidentiary Objection: lacks foundation, hearsay (not subject to business records exception), legal conclusion). |

Joshua Koltun ATTORNEY

- 14 -

| | | |
|---|---|---|
| 37.  The Photographs delivered to Fox included Photographs 1, 2, and 3.<br><br>Depo. (Koltun Decl., Exh A) 90:1-92:10; 147:8-149:9; 199:2-10; 207:16-209:12.<br>Koltun Exhibit 33 (Grecco000083-84)<br>Licata Decl., ¶ 28 & Exh. B<br>Koltun Decl., ¶ 6 & Exh. F.<br>Copyright Registration VA-1-232-596 (Carter Decl., Exh. C, Liv242-244)(stating first publication date of Photograph 1 as May 8, 1995)<br>Copyright Registration VA2-030-741 (Carter Decl., Exh. C, Liv237-239)(stating first publication date of Photograph 2 as October 25, 1993<br>Copyright Registration VA2-063-319 (Carter Decl., Exh. C, Liv231-234)(stating first publication date of Photograph 3 as October 25, 1993) | Undisputed, except to the extent this suggests that Fox retained the Subject Photographs—the cited testimony makes clear that Fox returned the images it did not license for promotional use. *See also,* Koltun Decl. ¶¶ 2, Exh. A, (Exh. 26 and 32); 7. | [Same rebuttal as Fact 36] |

- 15 -

Joshua Koltun ATTORNEY

Joshua Koltun ATTORNEY

| | | |
|---|---|---|
| 39. In June 1995, Hamilton signed another agreement on Grecco's behalf ("1995 Agreement"), in which Fox chose fourteen photographs from among the *X-Files* photographs Grecco had taken, and Grecco "assigned all right title and interest" in those photographs, and also agreed that Fox was "free, in its sole discretion, … to utilize and exploit the Photographs worldwide, in perpetuity, in any manner it may deem appropriate, including without limitation, uses on or in connection with the merchandising, commercial tie-in, advertising, promotion, and literary publishing activities arising out of or related to 'THE *X-FILES* television series." <br><br> Koltun Decl., Exh 29 Depo. (Koltun Decl, Exh. A) 173:1- 178:18; 190:24-194:22 | Undisputed (with the notation that those fourteen photographs did not include the Subject Photographs). | Livingly stipulates that the 14 photographs did not include the Subject Photographs, although they include photographs that are quite similar to Photographs 1 and 2. *Compare* photographs in Koltun Decl., Exhibit 32. (Quite similar, but not indistinguishable as are the purportedly "different" photographs discussed in the Grecco Declaration.) |

- 16 -

| | | |
|---|---|---|
| 40. Although Grecco contends that Hamilton would make deals without his knowledge and approval concerning his photographs, in order to increase her commissions, he nevertheless continued to use Hamilton as his agent at all relevant times, and did not stop working through her agency until she retired in 2005 or thereabouts.<br><br>Depo. (Koltun Decl., Exh A) 76:3-6; 172:2-18;176:1–177:19; 190:24-194:22 | Disputed to the extent this suggests that Grecco knew of Hamilton's malfeasance prior to 2005 (no evidence supports that assertion). | The following evidence shows that Grecco indeed was aware prior to 2005.<br><br>He claims to have sent a fax to Oakes shortly after the 1994 Agreement, stating that she had no authority to sign agreements on his behalf. Koltun Decl., Exh. A (Depo.) 172:7-18; 175:6-14; 192:12-193:14; Exh. 29 Exhibit 1 thereto (TCF000151).<br><br>In 1995, he was aware that Hamilton and Oakes had "gone behind his back" and changed the number of photographs selected from 12 to 14, and he "acquiesced to the 14." *Id.* 176:1-177:19 |

Joshua Koltun ATTORNEY

Joshua Koltun ATTORNEY

| | | |
|---|---|---|
| 41. Grecco licensed the Photographs to the Studios<br><br>Complaint in *Michael Grecco Productions, Inc. v. Upproxx Media, Inc.* (Koltun Decl, Exh. G.), ¶¶16 & Exhs thereto 2, 3, & 4 [Grecco1246, 1248 & 1249)<br>2019 Agreement (Koltun Decl., Exh. 32)<br>1994 Agreement (Koltun Decl, Exhibit 28 (Exhibit C thereto, Grecco000498-409)<br>Koltun Decl., Exh 23 (invoices)<br>Declaration of Grecco in *Everett* case (Koltun Decl., Exh. 26)<br>Assignment Invoices introduced into evidence in *Everett* case (Koltun Decl., Exh. 27)<br>Grecco Interrogatory Response (Koltun Decl., Exh. B), Responses 1, 2, 3<br>Copyright Registration VA2-063-319 (Carter Decl., Exh. C, Liv231-234)(stating first publication date of Photograph 3 as October 25, 1993)<br>Copyright Registration VA2-030-741 (Carter Decl., Exh. C, Liv237-239)(stating first publication date of | Disputed. None of the evidence cited establishes that Grecco licensed the Photographs to the Studios. In fact, the Photographs Livingly points to that were used by the studios are different. Grecco Decl. ¶¶ 3, 6. Koltun Decl. ¶¶ 2, Exh. A, (Exh. 26 and 32); 7. | The "Photographs Livingly points to" refers to the complaint in *Grecco v. Upprox*x, (Koltun Decl. Exh. G), in which he specifically represented that the photographs in that case (which certainly appear to be the Photographs) were licensed to the studios, and provides the copyright information matching the copyrights at issue in this action for the Photographs.<br><br>Tthe Grecco declaration does ***not*** address whether the photographs in the *Upproxx* case are "different" from the Photographs in this case. For that matter, the Grecco declaration only addresses whether certain materials Koltun bought on the memorabilia market were the Photographs. It does not purport to opine on whether the photographs Livingly published are the Photographs or rather the "different" photographs that were taken in sequence with the Photographs. |

- 18 -

| Photograph 2 as October 25, 1993 Copyright Registration VA-1-232-596 (Carter Decl., Exh. C, Liv242-244)(stating first publication date of Photograph 1 as May 8, 1995) | | |

Joshua Koltun ATTORNEY

- 19 -

Joshua Koltun ATTORNEY

| | | |
|---|---|---|
| 43. In 2019, Fox and Grecco entered into a settlement agreement ("2019 Agreement"). Among the terms of the 2019 Agreement, the parties agreed that<br><br>• The *X-Files* Photographs that Grecco took are referred to as the "Gallery Photographs," the 14 Photographs subject to the 1995 Agreement are referred to as the "All Media Photographs," and all others as the "Remaining Gallery Photographs" ; the possibility that Fox had made use of photographs in a manner that exceeded the scope of the 1994 and 1995 Agreements was referred to as the "Questioned Uses"  [p.1]<br><br>• Neither party "disputes or repudiates" the 1994 Agreement, but the parties state that the 1994 Agreement "provides for, and only for, Fox's nonexclusive advertising and publicity use, in perpetuity, in all media now on or hereafter devised, throughout the world, of the Gallery Photographs, including the right to sublicense the Gallery Photographs for advertising and publicity purposes" [¶1] and further provided that Fox's license "permits all advertising and publicity uses, including but not limited to | Undisputed (with the clarification that the Gallery Photographs do not include the Subject Photographs). Koltun Decl. ¶¶ 2, Exh. A, (Exh. 26 and 32); 7. | The "clarification" is premised on Grecco's erroneous legal interpretation of the 2019 Agreement, which is discussed in Livingly's Reply brief, section I.D.<br><br>Koltun Decl. Exh. 26 does not support the "clarification."  That is a declaration in the *Everett* case, in which the defendants were a stock photography agency.  The declaration specifically indicates that the photographs at issue were licensed to the studios, in paragraph 6 & 7.<br><br>The reference to Koltun Decl., ¶ 7 simply reiterates what Fox found in its 2017 search; to the extent that an inference can be drawn from Fox's failure to find these photographs in 2017, that inference is negated by the undisputed portion of Fact 36 , which is that Grecco *did* deliver the photographs.  See also Dispute re Whiteleather Declaration re Additional Material Fact 69 below. |

- 20 -

retrospective advertising and publicity uses and archival advertising and publicity uses." [¶12].

• Neither party "disputes or repudiates" the 1995 Agreement, but the parties state that the 1995 Agreement "provides for an assignment by Grecco to Fox of all right, title and interest including, without limitation the copyright in and to the 14 All Media Photographs," [¶2].

• Notwithstanding Fox's ownership of the 14 All Media Photographs, "nothing herein prevents Grecco from licensing for advertising, publicity, merchandising, or other purposes, any other photographs that may bracket or be substantially similar to or even visually indistinguishable from the 14 All Media Photographs." [¶4]

Grecco and Fox mutually released all claims against each other, including any "Questioned Uses" that commenced before the 2019 Agreement. [¶6]

Koltun Decl., Exh. 32 Depo. (Koltun Decl., Exh A), 196:3- 207:14.

Joshua Koltun ATTORNEY

| | | |
|---|---|---|
| 44. In 1997, Grecco through counsel corresponded with Fox concerning the manner in which it distributed the *X-Files* photographs he had taken, and was informed by Fox that in the event someone "came into possession" of those photographs, the photographs "clearly state[] that the permission granted only to newspapers and periodicals to reproduce the image in question for publicity or editorial purposes in connection with [Fox Broadcasting Company] programming [and] 'must not be sold, leased, or given away.'"] Fox also supplied him with samples of promotional photographs that Grecco had taken, which were marked with Fox's copyright. The black and white glossy photograph also contained the following language: "Exclusively for use in advertising and promotion relating to television exhibition through Fox Broadcasting Company. All other rights reserved." The color transparencies (i.e. slides) provided to Grecco did not have the | Disputed as phrased. The referenced correspondence did not concern "the manner in which [fox] distributed the *X-Files* photographs [Grecco] had taken," but rather concerned a limited subset of those photographs and not the Subject Photographs at issue in this case. See Koltun Decl. ¶¶ 2, Exh. A, (Exh. 26 and 32); 7. | The inquiry called upon Fox to state its "licensing policies and procedures," and said "please use language in your letter that you deem accurate and appropriate." TCF0000161. In response, Fox indicated that if a person "came into possession of" Fox photos "from another source" than the Fox publicity department," the "cardboard mounts on each color transparency which we distribute clearly states that the permission granted only to newspapers and periodicals to reproduce an image in question for publicty or editorial purposes in conjunction with FBC programming."<br><br>(Insofar as this dispute is based on the contention that Fox never had the Photographs and/or never distributed them, see Rebuttal to Additional Material Fact 69 below, but the foregoing evidence is nevertheless evidence of Grecco's acquiescence in the custom and practice in the industry with regard to promotional photographs). |

- 22 -

Joshua Koltun ATTORNEY

Joshua Koltun ATTORNEY

| permissions language, although they were marked "© Fox Broadcasting Company. All Rights Reserved." Koltun Decl., Exh. 29 at TCF0000148 & Exh. 3 thereto (TCF157-161) Depo. (Koltun Decl., Exh A) 170:1- 186:17 | | |
|---|---|---|
| 45. Grecco did not object, either to Fox's copyright notice or to the permissions language quoted in the 1997 Correspondence. Depo. (Koltun Decl., Exh A) 170:1- 186:17 | Disputed as phrased. The referenced correspondence did not concern "the manner in which [fox] distributed the *X-Files* photographs [Grecco] had taken," but rather concerned a limited subset of those photographs and not the Subject Photographs at issue in this case. See Koltun Decl. ¶¶ 2, Exh. A, (Exh. 26 and 32); 7. | See Rebuttal to Disputed Fact 44 above, and see the deposition testimony referenced |

- 23 -

Livingly Statement of Rebuttal                                                2:20-cv-00151 DSF-JC

| | | |
|---|---|---|
| 54. In the custom and practice of the industry, Livingly's use of the Photographs were entirely consistent with the customary and intended use of promotional photographs in editorial content referencing the underlying shows.<br><br>Licata Decl., ¶ 32. | Disputed. ¶ 32 of the Licata Decl. does not establish Livingly's offending use as "editorial content," or state that "Livingly's use of the Photographs were entirely consistent with the customary and intended use of promotional photographs." | Grecco's "dispute" that the language of Licata's paragraph 33 does not precisely track the proposed Fact 54 is silly.<br><br>Insofar as Grecco's dispute is premised on its contention that Livingly's Articles are not "editorial content" because they are too "vapid," Mr. Licata does share Grecco's [purported] disdain.<br><br>[Livingly's citation was (obviously) a typo. The relevant paragraph was ¶ 33. Livingly apologizes for the error.] |

Livingly Statement of Rebuttal                                         2:20-cv-00151 DSF-JC

Joshua Koltun ATTORNEY

| | | |
|---|---|---|
| 55.  None of the authors of the articles just mentioned specifically recalls where they found the Photographs on the internet, but all of the authors testified that, based on their training and Livingly's guidelines, they assume now and would have assumed at the time, that the photograph in question was a promotional photograph.  They would have assumed that the copyright in the Photograph was held by the studio, and in any event that Livingly was licensed to use the photograph in the manner in which it did.  Nevertheless, if the Photograph had carried a copyright notice from Grecco or any other professional photographer, they would not have used the photograph.  Declarations of Abid, Trowbridge, Conway and Madani. | Undisputed as to the testimony of the authors, but disputed as to the truth of the statements as they conflict with Livingly's internal policies.  Declaration of Stephen M. Doniger ("Doniger Decl."), ¶¶ 1-6, Exh. 1-6. | Although the Doniger Declaration does not provide any foundation with respect to Livingly's policies, Livingly will stipulate that the documents at Exhibit 3 are are authentic, subject to the caveat that the exhibit shows multiple versions of the policies as they evolved over time.  Grecco cites language in an early version of the policies that it contends support that contention, but it ignores this policy: "OKAY to use …Photo stills from movies and TV shows …Basically, any image that is used to promote a piece of media." SDF 77 (Doniger Decl., Exh. 3, LIV00010, 12, 14.) These were policies that were changed over time. At some point Livingly changed the policy to include: "Please pull imagery directly from the show, film, or band website (rather than Google) and please properly credit both the network/studio and any photographer that is listed." *Id.* (Liv00016). This change matches Livingly's conduct in response to Grecco's cease |

- 25 -

| | | |
|---|---|---|
| | | and desist letter.  See Facts 62, 63. |
| 57. The four Photographs are among the "classic" images that Grecco frequently sues over.<br><br>Depo. (Koltun Decl., Exh A) 35:9-14 | Disputed, but this statement by Livingly is merely meant to be inflammatory and warrants no further response. | The Fact was introduced, not to be inflammatory, but as relevant to the (anticipated) issue of whether Grecco and his agents could reasonably have discovered Livingly's putative infringement earlier.  Since Grecco has not introduced any evidence as to when his agents first discovered the putative infringement, the issue whether they could reasonably have discovered earlier need not be reached. |
| 61. On November 18, 2018, Grecco (acting directly, not through counsel), sent Livingly a cease and desist letter based on a use by Livingly of Photograph 1 that is not the use at issue in this case.<br><br>Carter Decl., ¶ 7 & Exh. A | [Grecco failed to include this fact in his Statement of Disputed Facts] | [Undisputed] |

Joshua Koltun ATTORNEY

- 26 -

Joshua Koltun ATTORNEY

| | | |
|---|---|---|
| 62. Livingly promptly removed that use of the photograph, and also performed a search to locate any other uses of *X-Files* photographs (whether or not Livingly had information that they were by Grecco).

Shinn Decl., ¶ 2 | Disputed. Doniger Decl. ¶ 6, Exh. 6. | Doniger Decl., Exh. 6 does not support the proposed fact. It is clear from the context, that these communications reflect effort made, not in November 2018 (note missing fact 61), but rather after the February and April 2019 cease and desist letters (see Fact 65). The communications reflect that a search had been done previously.

Evidentiary Objection to Doniger Decl., ¶ 6, seeking to characterize the communications. Best evidence. |
| 63. Livingly replaced every still photograph of *X-Files* that it found on its websites with a screenshot taken from actual footage of the television show.

Shinn Decl., ¶ 2. | Disputed. Shinn Decl., ¶ 3. | The proposed Fact states, as does the Shinn Decl, ¶ 3, that Livingly removed every still photograph of X-files *that it found.* As noted in Fact 64, it missed some. See also Rebuttal to Fact 62. |
| 64. However, because of technical limitations on its ability to search content on its websites, Livingly inadvertently overlooked uses of still photographs at issue in this case.

Decl., ¶ 3. | Undisputed that Livingly continued to infringe Grecco's image and that there are technical limitations on the ability to search content on websites. Disputed as to Livingly's state of mind. | The technical limitations referred to would not have been reverse image searches of the internet (as opposed to an internal search of Livingly's publishing platform software), because Livingly was searching for any X-files images. Shinn Decl., ¶ 2. |

- 27 -

## GRECCO ADDITIONAL  MATERIAL FACTS

| *Grecco Proposed Fact* | *Livingly Dispute* |
| --- | --- |
| 67. Subject Photographs 1, 2, and 3 were never included in a Fox press kit or otherwise distributed by Fox, nor were they available on Fox's website when Livingly "found" them on the internet.<br><br>Declaration of Stephen M. Doniger ("Doniger Decl.") ¶ 6, Exh. 6 | Undisputed that the that the attached communication is authentic.<br><br>Disputed insofar as there is any implication that the communication indicates that the Photograph would *never* have been in a Fox press kit, or was not a promotional photograph. Areeba Abid testified (as did all of Livingly's authors), that Fox's *website* only contained press kits as to shows that were currently broadcast *on Fox*, not to older shows. Doniger Decl., ¶1, Exh. 1, 18:14-22, 22:13-23:8. There is no implication in the statement by Conway to indicate anything more than that.  (Indeed, to the extent that Grecco is suggesting that Conway's statement "that's not how it works" supports its contention that Fox did not distribute Photographs 1, 2, or 3, the suggestion is bizarre.  Grecco concedes that Fox distributed other, similar photographs. Grecco Decl., ¶ 8.  On what basis is Grecco suggesting that Conway could have known that Photographs 1 2 and 3 were (as he contends) never distributed by Fox?)(Evid. Objection: Lacks foundation, hearsay)<br><br>(Evidentiary objection to Doniger Declaration, ¶ 6, insofar as it purports to characterize or interpret the communications, which speak for themselves.) |

Joshua Koltun ATTORNEY

Livingly Statement of Rebuttal                                                                2:20-cv-00151 DSF-JC

| | |
|---|---|
| 68. Indeed, Defendant's former editor, who used Subject Photograph 1, informed her colleagues that she was searching her records to determine if Subject Photograph 1 may have been in a press kit from Fox, while simultaneously conceding that Subject Photograph 1 would not be in a Fox press kit because "that is not how it works."<br><br>Doniger Decl., ¶ 6, Exh. 6. | Undisputed that the that the attached communication is authentic.<br><br>Disputed insofar as there is any implication that the communication indicates that the Photograph would *never* have been in a Fox press kit, or was not a promotional photograph. Areeba Abid testified (as did all of Livingly's authors), that Fox's *website* only contained press kits as to shows that were currently broadcast *on Fox*, not to older shows. Doniger Decl., ¶1, Exh. 1, 18:14-22, 22:13-23:8. There is no implication in the statement by Conway to indicate anything more than that. (Indeed, to the extent that Grecco is suggesting that Conway's statement "that's not how it works" supports its contention that Fox did not distribute Photographs 1, 2, or 3, the suggestion is bizarre. Grecco concedes that Fox distributed other, similar photographs. Grecco Decl., ¶ 8. On what basis is Grecco proposing that Ms. Conway have have known that Photographs 1, 2 and 3 were (as he contends) never distributed by Fox?)<br><br>(Evidentiary objection to Doniger Declaration, ¶ 6, insofar as it purports to characterize or interpret the communications, which speak for themselves.) |

Joshua Koltun ATTORNEY

- 29 -

Joshua Koltun ATTORNEY

| | |
|---|---|
| 69. Fox has stated under oath that it never had Subject Photographs 1, 2, or 3 in its possession, and certainly never gave any third parties the right to use those images.<br><br>Doniger Decl. ¶ 7, Exh. 7. | Contrary to the "certainly" inserted into this proposed Fact, the Whiteleather Declaration (Exh. 7) is a syllogism, to wit: because Whiteleather's staff did not find Photographs 1, 2, and 3 in the search he performed in 2017, he surmises (1) that Fox never ("to the best of its knowledge" had access to those Photographs, and (2) **therefore** could not have given any third party the right to use the Photographs.<br><br>The premise of that syllogism is negated by Grecco's Declaration, ¶ 8, and by the undisputed portion of Fact 37 above, and, which is that Photographs 1, 2, and 3 **were** delivered to Fox. *See also* Additional Material Fact 70 below [**all** Photographs were delivered to the Studios.,<br><br>Whiteleather's search was performed in August 2017, prior to sending Grecco a cease and desist letter to halt his "licensing business" (September 1, 2017), see Exhibit 28. The search did not yield **any** press kits in the form they would actually have been distributed, as opposed to raw contact sheets. Koltun Decl., ¶ 7.<br><br>Whiteleather did not appear to have been aware, as of the time he ordered the search in August 2017, of the 1995 transaction in which, Grecco concedes, see Fact 37, he delivered Photographs 1, 2 and 3 to Fox, That transaction was brought to his attention by Grecco's counsel. See Exhibit 29, TCF148. Subsequently Whiteleather located the |

- 30 -

Joshua Koltun ATTORNEY

1995 Agreement.  See Exh. 30, TCF 167, and Exh. E thereto.

In the course of the dispute, and subsequent to the 2017 search, Grecco brought to Whiteleather's attention evidence that showed Fox had been using many Grecco photographs in merchandising other than the 14 photographs, the copyright to which had been purchased in 1995.  See (Undisputed) Fact 42, and in particular see Exhibit 33, in which Grecco's counsel sent multiple examples of Fox having used photographs other than the 14 chosen by Fox (including Photograph 3, see "infringement 6 and 7, Cloth C[oats] Gillian Arms Crossed] (The 14 photographs are at the beginning of Exhibit 32.)

In response this information, Whiteleather negotiated the 2019 Agreement, which ensured not only that Fox had promotional rights to all X-files Photographs Grecco had taken, but also that Fox and all of its affiliates were released from liability for any of its "Questioned Uses" of those photographs.  See Reply Brief at I.D & n. 5.  (Facts 38, 43)

Whiteleather avoided being cross-examined on the foregoing by providing Grecco with his Declaration in lieu of appearing at a 30(b)(6) deposition.  2nd Koltun Decl., ¶ 3.

Objections to Whiteleather Declaration. Lacks Foundation, Hearsay not subject

- 31 -

| | to the Business Records or Absence of Business Records exception.<br><br>Objection to Doniger Declaration ¶ 7 insofar as it purports to characterize Exh. 7 (Whiteleather Decl.. Lacks foundation, Best Evidence. |
|---|---|

Joshua Koltun ATTORNEY

- 32 -

| | |
|---|---|
| 70. After giving the Studios copies of his photographs so that they could choose which they wanted to use promotionally, Grecco understood that the Subject Photographs were not chosen, had been returned to him, and would not be distributed to the media. Moreover, Grecco has never come to learn and has never agreed that any studios were distributing the Subject Photographs to the media.<br><br>Declaration of Michael Grecco ("Grecco Decl."), ¶ 7 | Undisputed that Grecco gave the Studios copies of the Photographs.<br><br>Disputed insofar as Grecco purports to have understood that the Studios did not retain copies of the Photographs or were not entitled to, or did not, distribute them.<br><br>Insofar as the Declaration is based on Grecco's interpretation of the 2019 Agreement, see Reply Brief at I.D.<br><br>Grecco also testified that Photographs 2 and 3 were given to the studios and not returned. Koltun Decl., Exh. A, 147:10-14.<br><br>The statement by Fox that it was returning the Photographs does not indicate whether it was retaining copies. The suggestion to the contrary misstates the relevant context. In the 1995 Agreement, Fox was purchasing an assignment of the copyrights to 14 pictures. Koltun Decl., Exh. 29, Exh. E thereto, TCF180-181). Thus it would have been entirely consistent for Fox to *not* return the photographs as to which Grecco no longer had any right, retaining a copy of those other photographs so that Fox could, at a minimum, continue to make promotional use of the photographs.<br><br>Even if it were true that Fox was *not* licensed to use the photographs that were returned for promotional use, Grecco specifically contended that Fox *had* continued to use photographs that were not returned. See (Undisputed) Fact 42, and in particular see Exhibit 33, in which Grecco's counsel sent multiple |

Joshua Koltun ATTORNEY

- 33 -

Joshua Koltun ATTORNEY

| | examples of Fox having used photographs other than the 14 chosen by Fox (including Photograph 3, see "infringement 6 and 7, Cloth C[oats] Gillian Arms Crossed] (The 14 photographs are at the beginning of Exhibit 32.)

Insofar as Grecco purports to see miniscule discrepancies between the Photographs and certain photographs that the Studios had in their possession, Livingly denies that these putative discrepancies exist.

Evidentiary objection, No foundation, hearsay not subject to business records exception, witness not disclosed as expert, Rule 30(b)(6), Rule 37(c) |
|---|---|
| 71. Livingly's employees admitted that they would regularly search for images on Google, and if the image "appeared" to them to be promotional (based on upon uncertain and indefinite criteria) they felt entitled to use the images on Defendant's websites.

Doniger Decl. ¶ 6, Exh. 6. | Undisputed that, for shows that were not current offerings, Livingly's employees would search for promotional images on the internet. [See discussion at Additional Material Fact 67, above].

Dispute the characterization of "uncertain and indefinite criteria."  The authors testified that they recognized the photographs as promotional on the basis that they depicted the actors who played the lead characters on the television shows, in their respective roles.  This is an accurate description of the Photograph.  See Undisputed Fact 2]__

Disputed, insofar as there is any implication that the photographs "appeared," *but were not,* promotional. The photographs *were* promotional. See Fact 1, 37. |
| [THERE IS NO 72] | |
| 73. Livingly's policies instructed employees to not use photographs where the original source could not be | Although the Doniger Declaration does not provide any foundation with respect to Livingly's policies, Livingly will |

- 34 -

Joshua Koltun ATTORNEY

| | |
|---|---|
| determined, to not use photographs from professional photographers, to provide proper attribution, and to reach out to ask for permission when it cannot be determined whether an image may be used or not.<br><br>Doniger Decl. ¶¶ 3, 4, Exh. 3, 4. | stipulate that the documents at Exhibit 3 are authentic, subject to the caveat that the exhibit shows multiple versions of the policies as they evolved over time.<br><br>Disputed that Livingly's use of the Photographs violated its policies. Grecco cites language in an early version of the policies that it contends support its proposed Fact, but it ignores this policy: "OKAY to use …Photo stills from movies and TV shows …Basically, any image that is used to promote a piece of media."  SDF 77 (Doniger Decl., Exh. 3, LIV00010, 12, 14.) These were policies that were changed over time.   At some point Livingly changed the policy to include: "Please pull imagery directly from the show, film, or band website (rather than Google) and please properly credit both the network/studio and any photographer that is listed." *Id.* (Liv00016).  This change matches Livingly's conduct in response to Grecco's cease and desist letter.<br>Dispute the suggestion (regarding attribution) that Livingly's authors were aware at the time of publication of Grecco's claim to copyright ownership. There is no evidence of such awareness, or even evidence of any reasonable means by which the authors could have discovered such claim.<br><br>Objection to Doniger characterizing the documents, which speak for themselves. |

Livingly Statement of Rebuttal                                                2:20-cv-00151 DSF-JC

Respectfully submitted,

Dated:  March 22, 2021                    _____\s_____
                                          Joshua Koltun
                                          Attorney for Defendant
                                          and Counterclaimant
                                          Livingly Media, Inc.