Joshua Koltun (Bar No. 173040)
Attorney
1 Sansome Street
Suite 3500, No. 500
San Francisco, California  94104
Telephone:  415.680.3410
Facsimile:  866.462.5959
joshua@koltunattorney.com

Attorney for Defendant and Counterclaimant
Livingly Media, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MICHAEL GRECCO PRODUCTIONS,
INC. d/b/a "Michael Grecco
Photography," a California corporation,

        Plaintiff,

        v.

LIVINGLY MEDIA, INC., a Delaware
Corporation; and DOES 1-10,

        Defendants.

Case No.: 2:20-c-00151 DSF-JC

NOTICE OF MOTION AND
MOTION OF LIVINGLY MEDIA,
INC. FOR SUMMARY
JUDGMENT AND
MEMORANDUM OF POINTS
AND AUTHORITIES

*Hearing:*
Date: April 5, 2021
Time:  1:30 pm___
Court: [Zoom Webinar]
Judge: The Hon. Dale S. Fischer

*Filed Herewith:*

Separate Statement
Declarations of Joshua Koltun,
Richard Licata, Erica Carter, Deena
Shinn, Cecily Trowbridge, Lani
Conway, Areeba Abid, and Kimia
Midani
[Proposed] Order

Joshua Koltun ATTORNEY

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on April 5, 2021, or such later date as the Court may set, at 1:30 pm, before the Honorable Dale S. Fischer, via Zoom Webinar as set forth on the Court's website at http://www.cacd.uscourts.gov/honorable-dale-s-fischer, Defendant and Counterclaimant Livingly Media Inc., ("Livingly") will and hereby does move under Federal Rule of Civil Procedure 56 for an order granting summary judgment to Livingly and against Plaintiff and Counterdefendant Michael Grecco Productions, Inc., ("Grecco") or, in the alternative, partial summary judgment that that Grecco is entitled only to the statutory damages for innocent infringement, and in that case only as to Photographs 2 and 4.

This motion is made on the grounds that there are no genuine issues of fact, and that Defendant is entitled to judgment (or partial judgment) as a matter of law, because (a) the photographs at issue were promotional photographs, licensed to the media for use in editorial commentary on the underlying television shows, and that Livingly's use was within the scope of that license; (b) that if Livingly's use of the photographs were not licensed it was fair use; (c) that the statue of limitations has run as to Photographs 1 and 3, and that (d) assuming *arguendo* that Livingly were liable, any infringement was innocent and that Grecco as a consequence is entitled only to minimal statutory damages.

This motion is based on this notice of motion and motion, the following memorandum of points and authorities, the supporting declarations of Joshua Koltun, Richard Licata, such matters of which the Court may take judicial notice, and other documents and pleadings on file in this matter and any further arguments that may be made at a hearing on this motion.

//

//

//

Joshua Koltun ATTORNEY

1    This motion is made following the conference of counsel pursuant to L.R. 7-3,

2    which took place on February 18, 2021.

3    Respectfully submitted,

4
Dated: March 1, 2021                    _____\s_____

5                                        Joshua Koltun
                                         Attorney for Defendant and Counterclaimant
6                                        Livingly Media, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

3

4   NOTICE OF MOTION AND MOTION ........................................................................i

5   TABLE OF AUTHORITIES ..................................................................................... v

    INTRODUCTION ..................................................................................................... 1

6   STATEMENT OF THE CASE .................................................................................. 2

7       A. This case involves four promotional photographs for television shows .............. 2

8       B. The purpose of promotional photographs is and was, obviously, to promote the

9          television shows; the custom and practice in the industry is to disseminate the

           photographs as widely as possible in the media to maximize publicity .......... 3

10
        C. Grecco's relevant dealings were all conducted through his agent ...................... 3
11

12      D. Grecco knew and acquiesced in the Studios' distribution of his promotional

           Photographs to the media for editorial use ........................................................ 7
13

14      E. Many years after Grecco took the Photographs, he registered them with the

           Copyright Office – without disclosing that they were derivative works – and
15
           began his "licensing" business, which consists entirely of settling
16
           infringement claims with retroactive "licenses" ............................................. 8
17
        F. Livingly used the promotional photographs in editorial commentary on the
18
           underlying television shows ............................................................................... 9
19
        G. Grecco has for many years conducted reverse image searches for uses of the
20
           Photographs, and does not know when his agents first discovered Livingly's
21
           use of the Photographs ................................................................................... 10

22      H. When Grecco sent it cease and desist letters, Livingly promptly took down the

           Photographs .................................................................................................... 10
23

24  ARGUMENT ........................................................................................................... 11

    I.  The Photographs were expressly created for the purpose of promoting the X-Files
25
        and Xena, Warrior Princess shows in the media; Livingly's use was within the scope
26
        of the license to do so ..................................................................................... 11
27
        A. The Photographs were derivative works of the copyrighted television shows;
           any rights Grecco has in the Photographs are subject to the studio's
           promotional purpose in permitting the creation of the Photographs ............. 11

26

27

28

Joshua Koltun ATTORNEY

B. In any event, Grecco expressly and impliedly licensed the media to use the photographs in editorial commentary on the underlying shows ................... 12

C. Grecco's "assignment invoices" neither negate nor limit the scope of the license to the media to use the promotional photographs .......................... 14

II. Livingly's use of the promotional Photographs in editorial commentary on the underlying television shows was fair use ................................................. 17

A. The "purpose and character" of Livingly's use of the photograph, to illustrate editorial commentary on the underlying television shows – strongly favors a determination of fair use ................................................................. 18

B. Since the promotional Photographs are derivative of the Studio's television shows and specifically created to be published by the media, the "nature of the copyrighted work" favors fair use .......................................... 18

C. Since the "amount and substantiality of the portion" of the work that Livingly used was appropriate to the purpose for which Livingly did so, this factor favors fair use. ................................................................. 19

D. Grecco cannot rely on circular reasoning to create an imaginary market for editorial licenses to these promotional photographs; thus the "effect of the use upon the potential market" favors fair use. ............................... 20

III. Grecco's claims regarding Photographs 1 and 3 are barred by the Statute of Limitations, because Livingly's articles were openly available on the internet for more than three years; Grecco cannot establish when he first discovered them, let alone that he could not reasonably could have discovered them earlier ................. 21

IV. Assuming Livingly were liable for infringement, Grecco is only entitled to minimal damages, since Livingly had no reason to know of his claim that its use of these promotional photographs constituted infringement ........................ 22

CONCLUSION .................................................................................. 24

Joshua Koltun ATTORNEY

1

### TABLE OF AUTHORITIES

2

**Cases**

*Am. Inst. of Architects v. Fenichel*, 41 F. Supp. 146, 147 (S.D.N.Y. 1941) ...........................19

*Anderson v. Stallone*, 1989 U.S. Dist. LEXIS 11109, at \*24-25 (C.D. Cal. Apr. 25, 1989)................11

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) .........................20

*Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995) (citation omitted)). ..............................13

*Budco, Inc. v. The Big Fights, Inc.*, 594 F.2d 900, 902 (2d Cir. 1979); .........................................14

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994).............................................17, 18, 19

*Cooley v. Penguin Grp. (USA), Inc.*, 31 F. Supp. 3d 599, 608 (S.D.N.Y. 2014)................................12

*County of Ventura v. Blackburn*, 362 F.2d 515, 518 (9th Cir. 1966) ...........................................14, 23

*Dhillon v. Doe*, , 2014 U.S. Dist. LEXIS 24676, at \*13-15 (N.D. Cal.)..........................................18

*Effects Assocs. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990). ...............................................12

*Elvis Presley Enters. v. Passport Video*, 349 F.3d 622, 629-30 (9th Cir. 2003). ...............................18

*Ermolieff v. R. K. O. Radio Pictures*, 19 Cal. 2d 543, 549-50 (1942) ...........................................13

*Foad Consulting Grp., Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 825-28 (9th Cir. 2001). .......13, 17

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003). ...................................................................................13

*Gabelli v. SEC*, , 568 U.S. 442, 448 (2013)....................................................................22

*Gilliam v. ABC*, 538 F.2d 14, 20-21 (2d Cir. 1976)................................................................12

*Harper & Row v. Nation Enters.* 471 U.S. 539, 550-51 (1985). .................................................19

*Hinton v. Nmi Pac. Enters.*, 5 F.3d 391, 395 (9th Cir. 1993). ...................................................21

*Howard Entm't, Inc. v. Kudrow*, 208 Cal. App. 4th 1102, 1114 (2012)…............................................13

*Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1153 (9th Cir. 1986)...........................13

*Live Face on Web, LLC v. Cremation Soc'y of Ill., Inc.*, 2019 U.S. Dist. LEXIS 82660, at \*2-3, \*10-12 (E.D. Pa. May 16, 2019) .......................................................................................16

*Mangum v. Action Collection Service*, , 575 F.3d 935, 941 (9th Cir. 2009)........................................22

*Michael Grecco Photography, Inc. v. Everett Collection, Inc.  Id.*, 589 F. Supp. 2d 375, 379-80 (S.D.N.Y. 2008). ...................................................................................4, 14, 16

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-77 (9th Cir. 2014) ........................................15

*Oceanside 84, Ltd. v. Fid. Fed. Bank*, 56 Cal. App. 4th 1441, 1449-51 (1997) ..................................14

*Philpot v. L.M. Communs. II of S.C.*, 2020 U.S. Dist. LEXIS 85901, at \*6 (E.D. Ky. May 15, 2020).21

*Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56, 64 (1st Cir. 2020). ...............................13

*Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 706-07 (9th Cir. 2004)...................................21

*Rotkiske v. Klemm*, 140 S. Ct. 355, 359-360 (2019)................................................................22

*S. Cal. Edison Co. v. Superior Court*, 37 Cal.App.4th 839, 851 (1995)............................................14

*Settel v. Office Appliance Co.*, 1959 U.S. Dist. LEXIS 4260, at \*4-6, 8-9 (N.D. Ill. June 15, 1959) ...13

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 447-50 (1984)..........................17, 19

*Specht v. Netscape Communs. Corp.*, 306 F.3d 17, 20-21, 28-30 (2d Cir. 2002)...............................15

*Toho Co., Ltd. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1215-16 (C.D. Cal. 1998) ...............11

*Viacom Int'l v. Tandem Prods.*, 368 F. Supp. 1264, 1275 (S.D.N.Y. 1974)........................................13

*Watson Land Co. v. Rio Grande Oil Co.*, 61 Cal. App. 2d 269, 271-72 (1943)…                  13

*Wendt v. Host Int'l, Inc.*, 197 F.3d 1284, 1286 (9th Cir. 1999) ...................................................11

*Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 68-69 (2017) .......................13

*Zim v. W. Publ'g Co.*, 573 F.2d 1318, 1324-25 (5th Cir. 1978) ...................................................14

Joshua Koltun ATTORNEY

**Statutes**

17 U.S.C. § 101.................................................................................................................11
17 U.S.C. § 107....................................................................................................18, 19, 20
17 U.S.C. § 412.................................................................................................................23
17 U.S.C. § 504 (c) (2)......................................................................................................23
17 U.S.C. § 507(b)............................................................................................................22
Cal. Civil Code § 1647.....................................................................................................14
Cal. Civil Code  § 1649....................................................................................................14

**Other Authorities**

Restatement of Contracts 2d  § 202(4.................................................................................14

Livingly Motion for Summary Judgment and MPA                                    2:20-cv-00151 DSF-JC

### INTRODUCTION

This case involves four promotional photographs for television shows that were, obviously, created for the express purpose of promoting those television shows. Grecco is the photographer who took those photographs, and for years he has been extracting nuisance settlements from media companies, that, like defendant Livingly, used those promotional photographs to illustrate articles about those television shows.[1]

The photographs depict the lead characters in the *X-Files* and *Xena, Warrior Princess.*  As such, the photographs are derivative works of the underlying shows, the copyrights to which are owned by the studios.  Any rights Grecco may have in those photographs are subject to the studio's promotional purpose in permitting him to create them.  The custom and practice in the industry was that any such photographs would be widely disseminated to the media precisely so that the media would use them as did Livingly: to illustrate commentary on the show.  Grecco knew and understood that the photographs would be so used.  Indeed, he knew that these photographs were being distributed with the studio's copyright notice, and did not object.

Even if the promotional license for these photographs were limited – for example, as Grecco contends, to friendly media or favorable coverage – any such limitation would be abrogated by the fair use doctrine, which is designed to provide more freedom to editorial commentary than the copyright holder might permit. Moreover, Grecco's argument that Livingly's use has harmed the market for his photographs is circular.  There is no market for the licensing of promotional photographs to the media companies that wish to comment on the shows.  On the contrary, Grecco's "licensing" business consists entirely of extracting nuisance settlements in the form of *retroactive* licenses for the challenged use.

---

[1]At the time this lawsuit was filed, Grecco had at least four other pending cases in this District Court concerning one or more of the photographs at issue in this case.  SS 7.

Joshua Koltun   ATTORNEY

Grecco has increased the value of his nuisance suits by treating the true facts concerning his dealings with the studios to be valuable trade secrets, which he only disclosed herein subject to this Court's "attorneys eyes only" protective order.

Assuming *arguendo* that Livingly infringed Grecco's copyrights, its infringement was entirely innocent.  Livingly had every reason to believe that it was permitted to use these promotional photographs to illustrate articles commenting on the respective television shows.  When it learned of Grecco's claims it promptly replaced his photographs with screenshots from the actual shows.  Thus the Court should award only minimal statutory damages.

This Court should award summary judgment to Livingly, and eliminate a major source of nuisance litigation that unnecessarily chills the media's ability to use promotional photographs for their intended purpose.

### STATEMENT OF THE CASE

### A.    *This case involves four promotional photographs for television shows*

This case involves four promotional still photographs ("Photographs") for television shows.  SS 1.  Photographs 1, 2 and 3 depict the actors David Duchovny and Gillian Anderson in their respective roles as Agents Mulder and Scully in the *X-Files*, and Photograph 4 depicts the actress Lucy Lawless in the title role of *Xena, Warrior Princess.*  SS 2.  The terms "promotional [still] photograph" and "publicity [still] photograph" are interchangeable.  SS 3.   "Editorial" use means a direct license to a media outlet to use the photograph, whereas "promotional" or "publicity" use means that the studio is licensed to send the photograph to the media so that the media might use the photograph in editorial use. SS 4.

The Photographs were taken by Michael Grecco, who operates through Michael Grecco Productions, Inc., plaintiff herein ("Grecco").   SS 5.  Grecco does not own any copyright interest the underlying television shows.  SS. 6.

Joshua Koltun   ATTORNEY

**B.**     *The purpose of promotional photographs is and was, obviously, to promote the television shows; the custom and practice in the industry is to disseminate the photographs as widely as possible in the media to maximize publicity*

The purpose of a promotional still photograph of a television show is, obviously, to promote that television show.  In the entertainment industry, the custom and practice was as follows.  Promotional photographs were distributed to the media precisely so that they would be published in editorial content concerning the television show.  SS 8.  The photographs would usually, but not always, be accompanied by language affirmatively indicating that permission was granted to the media (not to a specific licensee) to use the photographs in editorial content relating to the television shows.  SS 9, 16.  The purpose of the permissions language was to encourage such use by the media; in the absence of such language the promotional purpose of the images was nevertheless understood in the industry.  SS 10.[2]  Promotional photographs were circulated, for example via press kits and direct communications with journalists, as widely as possible; the aim was to maximize publicity for the show.  SS 11.   Access to photographs was not conditioned on the media giving favorable coverage.  SS 12.  Promotional photographs had no expiration dates.  SS 13.

**C.**     *Grecco's relevant dealings were all conducted through his agent*

Fox and MCA,[3] the studios that owned the copyrights in the television shows ("Studios") arranged directly with Grecco to take Photographs 2, 3 and 4, and granted

---

[2]Fox has not retained copies of its old press kits, but *X-Files* press kits purchased on the memorabilia market include Grecco's black and white promotional photographs with permissions language on the bottom, and color transparencies (slides) that sometimes have permissions language, sometimes only the Fox copyright notice, and sometimes bear no language at all.  SS 14.  Among the press kits that were located was one that contained Photograph 2. SS 15.

[3] The corporate Fox entity with which Grecco contracted was Twentieth Century Fox Film Corporation ("Fox"); the television show was also broadcast over the Fox

Joshua Koltun ATTORNEY

Grecco permission to take Photograph 1.  SS 19-21.   Grecco licensed the Photographs to the Studios.  SS 41.

Specifically, Photographs 2 and 3 were commissioned by Fox and taken in the same photoshoot in 1993.  SS 19.  USA Weekend Magazine arranged with Fox for permission to have photographs taken of the lead actors on the set of the *X-Files* in Vancouver, and commissioned Grecco to take the photographs, including Photograph 1, in March 1995.  SS 20.  Photograph 4 was commissioned by MCA and taken on the set of *Xena, Warrior Princess* in 1997.  SS 21.

When Grecco took the Photographs, and for a number of years thereafter, he worked through an agent, Maggie Hamilton, who was compensated with a percentage of Grecco's fees.  SS 22.  During the 1990s, Hamilton's agency was associated with the Sygma stock photographic agency and during that time she also acted as the stock photography agency for Grecco.  SS 23.

When an organization wished to hire Grecco to take a photograph, Hamilton would negotiate the details, create a document consisting of an an estimate of what the job would cost and the "usage" that was being licensed, and fax it to the Studio in advance of the job.  SS 24.  Hamilton has retired and retained no records.  SS 25.

Grecco has not retained the records of these advance estimate/licenses for the Photographs, only his "assignment invoices," which were documents he created after the photoshoots were completed.   SS 25.  Although Grecco relies – and historically has relied -- upon his "assignment invoices" as the operative licenses, the documents that he produced in this action (and previous actions)[4] are not, for the most part, documents that were actually sent to the **Studios**; rather these are invoices that Grecco sent to **Hamilton,** after each job was completed.  SS 26.

_____

network, the Fox Broadcasting Company.  The Xena photograph was commissioned by MCA Television Group ("MCA")

[4] *Michael Grecco Photography, Inc. v. Everett Collection, Inc.  Id.,* 589 F. Supp. 2d 375, 379-80 (S.D.N.Y. 2008).

- 4 -

Joshua Koltun ATTORNEY

Hamilton, in turn, would send a *different* assignment invoice to the Studio.  SS 28.  The "usage" language on the face of those invoices would *not* necessarily match the language on Grecco's invoice to Hamilton.  SS 28.  Indeed, in the one instance in which Grecco has a copy of the invoice that Hamilton sent to the Studio, the language on that invoice differs from the language on Grecco's invoice to Hamilton.  SS 29.

By the same token, the "terms and conditions" that Grecco has produced are the fine print that he *contends* that Hamilton was *supposed to* have included along with the assignment invoices that she sent to the Studios.   SS 30. Hamilton had stationary printed with these terms on the back, but the fine-print would have been faxed, if indeed it was included with the invoices at all.  SS 31.

In December 1994, Hamilton signed an agreement on Grecco's behalf with Fox ("1994 Agreement"). SS 35. That agreement provided, among other things, that Grecco assigned "all right, title, and interest" in all the photographs he had taken of the *X-Files*, and agreed that Fox was "free, in its sole discretion without further compensation to you, (other than any compensation heretofore agreed to be paid to you by or on behalf of Delphi Internet Services) to utilize and exploit the [*X-Files*] Photographs worldwide, in perpetuity, in any manner it may deem appropriate, including without limitation, uses on or in connection with merchandising, commercial tie-in, advertising, promotion, and literary publishing activities arising out of or related to 'THE X-FILES' television series." *Id.*

Sometime after signing the 1994 agreement and before June 29, 1995, Grecco delivered to Fox the photographs of all three *X-Files* shoots he had taken, including the 1993 and 1995 shoots at which Photographs 1 2 and 3 were taken, and specifically including Photographs 1, 2 and 3.  SS 36, 37.

In late 1994 or 1995, Delphi Internet Services, a corporate affiliate of Fox, advertised a promotional offer in which subscribers to Delphi would receive, among other promotional benefits, a "a database of official downloadable *X-Files* photos,

1   video, soundtrack and program synopsis." SS 38.  Grecco licensed one of his

2   photographs to Delphi for use in that advertisement.  SS 39.

3       In June 1995, Hamilton signed another agreement on Grecco's behalf ("1995

4   Agreement"), in which Fox chose fourteen photographs from among the *X-Files*

5   photographs Grecco had taken, and Grecco "assigned all right title and interest" in

6   those photographs, and also agreed that Fox was "free, in its sole discretion, … to

7   utilize and exploit the Photographs worldwide, in perpetuity, in any manner it may

8   deem appropriate, including without limitation, uses on or in connection with the

9   merchandising, commercial tie-in, advertising, promotion, and literary publishing

10  activities arising out of or related to 'THE *X-FILES* television series." SS 39.

11      Although Grecco contends that Hamilton would make deals without his

12  knowledge and approval concerning his photographs, in order to increase her

13  commissions, he nevertheless continued to use Hamilton as his agent at all relevant

14  times, and did not stop working through her agency until she retired in 2005.  SS 40.

15      In 2017, Fox and Grecco had a legal dispute in which Fox contended that it was

16  copyright owner of all *X-Files* promotional photographs that Grecco had taken, whereas

17  Grecco contended that he was the copyright owner.  SS 42.  Grecco also claimed that

18  Fox had exceeded the scope of the licenses to the *X-Files* photographs, for example, by

19  making "merchandising" uses of photographs beyond the fourteen in the 1995

20  Agreement.  *Id.*

21      In 2019, Fox and Grecco entered into a settlement agreement ("2019

22  Agreement").  Among the terms of the 2019 Agreement, the parties agreed that

23
24  • The *X-Files* Photographs that Grecco took are referred to as the "Gallery
25  Photographs," the 14 Photographs subject to the 1995 Agreement are
    referred to as the "All Media Photographs," and all others as the
26  "Remaining Gallery Photographs" ; the possibility that Fox had made use
    of photographs in a manner that exceeded the scope of the 1994 and 1995
27  Agreements was referred to as the "Questioned Uses"  [p.1]

28

Joshua Koltun ATTORNEY

- 6 -

- Neither party "disputes or repudiates" the 1994 Agreement, but the parties state that the 1994 Agreement "provides for, and only for, Fox's nonexclusive advertising and publicity use, in perpetuity, in all media now on or hereafter devised, throughout the world, of the Gallery Photographs, including the right to sublicense the Gallery Photographs for advertising and publicity purposes," [¶1] and further provided that Fox's license "permits all advertising and publicity uses, including but not limited to retrospective advertising and publicity uses and archival advertising and publicity uses."  [¶12].

- Neither party "disputes or repudiates" the 1995 Agreement, but the parties state that the 1995 Agreement "provides for an assignment by Grecco to Fox of all right, title and interest including, without limitation the copyright in and to the 14 All Media Photographs," [¶2].

- Notwithstanding Fox's ownership of the 14 All Media Photographs, "nothing herein prevents Grecco from licensing for advertising, publicity, merchandising, or other purposes, any other photographs that may bracket or be substantially similar to or even visually indistinguishable from the 14 All Media Photographs."  [¶4]

- Grecco and Fox mutually released all claims against each other, including any "Questioned Uses" that commenced before the 2019 Agreement.  [¶6] SS 43.

### D.  *Grecco knew and acquiesced in the Studios' distribution of his promotional Photographs to the media for editorial use*

In 1997, Grecco, through counsel, corresponded with Fox concerning the manner in which it distributed the *X-Files* photographs he had taken, and was informed by Fox that in the event someone "came into possession" of those photographs, the photographs "clearly state[] that the permission granted only to newspapers and periodicals to reproduce the image in question for publicity or editorial purposes in connection with [Fox Broadcasting Company] programming [and] 'must not be sold, leased, or given away.']   Fox also supplied him with samples of promotional photographs that Grecco had taken, which were marked with Fox's copyright.  SS 44. Grecco did not object to the permissions language, or to Fox's copyright notice.  SS 45.

Joshua Koltun ATTORNEY

**E.    Many years after Grecco took the Photographs, he registered them with the Copyright Office – without disclosing that they were derivative works – and began his "licensing" business, which consists entirely of settling infringement claims with retroactive "licenses"**

Some 8 to 24 years after taking the *X-Files* and *Xena* photographs, Grecco registered the copyrights in the Photographs. SS 46.  In none of his copyright registrations did he indicate that the photographs were derivative works.  *Id.*

Grecco has used a number of stock photographic agencies to license his work to the public, including the Sygma agency and Getty Images.  SS 47.  As of about 10 years ago, Grecco was licensing his work to the public through his own website, mgpstockphotos.photoshelter.com ("MGPStockPhotos").   On MGPStockPhotos, Grecco purports to license the Photographs for editorial use.  SS 49.  In his claims in court, he cites his stated licensing fees for editorial use of the photographs. *Id.*

In fact, Grecco has never issued a prospective license – as distinguished from a retroactive license for a putative act of infringement – for editorial use, to any of the Photographs, through his own or any other agency, with the exception of a tiny amount of licensing revenue he received for two of the Photographs during the five years he licensed all his photographs through Getty Images.  SS 50.[5]

In this litigation, Grecco has taken the position that the foregoing communications and dealings with Fox, including the 1994, 1995, and 2019 Agreements and the 1997 and 2017 correspondence, his retroactive putative "licenses," and his lack of any revenue from prospective licensing of the Photographs, are "trade secrets," and has produced them subject to the "Attorneys Eyes Only" provisions of the Court's Protective Order.  SS 52.

---

[5]Getty Images offered Grecco's Photographs as part of a "wholesale" license in which users licensed Getty's entire database of images, the overwhelming majority of which are not promotional photographs. SS 51.  During the several years that Grecco offered the Photographs for licensing via Getty Images, no one ever licensed Photographs 2 or 3.  the total Getty revenue for Photograph 1 was $750.53, of which Grecco received $268.23; for Subject Photo 4, total Getty revenue for Photograph 4 was $460.25, of which Grecco received $221.45.  *Id.*

Joshua Koltun ATTORNEY

**F.      *Livingly used the promotional photographs in editorial commentary on the underlying television shows***

Livingly is an online media company that operates the websites

www.zimbio.com and www.livingly.com.    The Photographs were openly posted on

those URLs in the following articles ("Articles"):

- On July 19, 2016, Livingly posted the article "*Movies and TV Shows to Watch If You're Obsessed with Netflix's 'Stranger Things*," which included *The X-Files* among the recommended shows, illustrated by Photograph 1.
- On October 9, 2017, Livingly posted the article "*TV Shows All Stranger Things Fanatics Will Love*," which included *The X-Files* among the recommended shows, illustrated by Photograph 2;
- On August 5, 2017, Livingly posted the article *"15 Amazing Shows You Didn't Know You Can Watch on Hulu Now,"* which included *The X-Files* among the recommended shows, illustrated by Photograph 2,
- On January 8, 2016, Livingly posted the article "*Are You Mulder or Scully for the X-Files,"* which was illustrated with a thumbnail of a portion of Photograph 3.
- On October 18, 2018, Livingly posted the article *"Clever Halloween Costumes Inspired By Badass Females,*" which recommended *Xena, Warrior Princess* as one of the characters one could dress up as, illustrated by Photograph 4.

SS 53.   In the custom and practice of the industry, Livingly's use of the Photographs

was entirely consistent with the customary and intended use of promotional

photographs in editorial content referencing the underlying shows.  SS 54.

None of the authors of the Articles specifically recalls where they found the

Photographs on the internet, but, based on their training and Livingly's guidelines, they

assume now and would have assumed at the time, that the photograph in question was a

promotional photograph.  They would have assumed that the copyright in the

Photograph was held by the studio, and in any event that Livingly was licensed to use

the photograph in the manner in which it did.  Nevertheless, if the photograph had

carried a copyright notice from Grecco or any other professional photographer, they

would not have used the photograph.  SS 55.

The total gross revenue Livingly received from the Articles was $1033.  SS 56.

### G.    Grecco has for many years conducted reverse image searches for uses of the Photographs, and does not know when his agents first discovered Livingly's use of the Photographs

The four Photographs are among the "classic" images that Grecco frequently sues over, or threatens to sue over.  SS 57.   Until 2018, Grecco used a reverse image search vendor called ImageRights to search for infringement of his photographs.  SS 58.  At some point, he also began to use an image-searching service provided by his law firm, Higbee & Associates, which itself relies in vendors to perform the actual searches.  SS 60.  Higbee & Associates performs evaluations of the viability of legal claims and then sends cease and desist correspondence to putative infringers, including Livingly.  *Id.*  Grecco does not know whether ImageRights discovered the use by Livingly of any of the Photographs.  SS 59.

### H.    When Grecco sent it cease and desist letters, Livingly promptly took down the Photographs

In November 2018, Grecco (acting directly, not through counsel), sent Livingly a cease and desist letter based on a use by Livingly of Photograph 1 that is not at issue in this case.  SS 61.  Livingly promptly removed that use of the photograph, and also performed a search to locate any other uses of *X-Files* photographs (whether or not Livingly had information that they were by Grecco).  SS 62.  Livingly replaced every still photograph of *X-Files* that it found on its websites with a screenshot taken from actual footage of the television show.  SS 63.  However, because of technical limitations on its ability to search content on its websites, Livingly inadvertently overlooked uses of still photographs at issue in this case.  SS 64.

In February and April, 2019, Higbee and Associates sent two cease and desist letters concerning the four Photographs, as well as, mistakenly, a different photograph that Livingly was not using. SS 65.   Livingly promptly removed the uses of the photographs it had failed to detect earlier. *Id.*   On January 6, 2020, Grecco filed the instant lawsuit. D.E.1.

Joshua Koltun ATTORNEY

1
2

### *ARGUMENT*

3
4

**I.** **The Photographs were expressly created for the purpose of promoting the X-Files *and* Xena, Warrior Princess *shows in the media; Livingly's use was within the scope of the license to do so***

5
6
7
8

> **A.** **The Photographs were derivative works of the copyrighted television shows; any rights Grecco has in the Photographs are subject to the studio's promotional purpose in permitting the creation of the Photographs**

9
10
11
12

The Photographs were promotional photographs; the Studios permitted Grecco to create them in order to promote their respective television shows. SS 1, 8. The Photographs depict the principal characters in the *X-Files*, Mulder and Scully, and Xena, the titular character of *Xena, Warrior Princess*. SS 2.

13
14
15
16
17

As such, the Photographs are "derivative works" of the primary works owned by the Studios. 17 U.S.C. § 101. Where "it is uncontroverted that the characters [in work B] were lifted lock, stock, and barrel" from copyrighted work A, work B is a "derivative work" of work A. *Anderson v. Stallone*, 1989 U.S. Dist. LEXIS 11109, at *24-25 (C.D. Cal. Apr. 25, 1989).[6]

18
19
20
21
22

Thus, although Grecco may own the copyright in the Photographs, this does not give him unrestricted ownership rights, because the rights of an owner of a derivative work are always subject to the rights of the owner of the underlying work from which it is derived. *Stewart v. Abend*, 495 U.S. 207, 221-36 (1990). If the creator of a derivative work has no authority from the owner of the underlying work to create that

23
24
25
26
27
28

---

[6] *See also Toho Co., Ltd. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1215-16 (C.D. Cal. 1998) (studio that owns Godzilla character owns publicity stills depicting Godzilla); *Wendt v. Host Int'l, Inc.*, 197 F.3d 1284, 1286 (9th Cir. 1999) (Kozinski, J. dissenting from denial of en banc review in right-of-publicity case) ("The presentation of the robots [that replicate characters] in the *Cheers* bars is a [copyright] derivative work, just like a TV clip, promotion, photograph, poster, sequel or dramatic rendering of an episode.")

Joshua Koltun ATTORNEY

derivative work, the derivative work is infringing. *Anderson*, 1989 U.S. Dist. LEXIS 11109 at *25. If the copyright holder had authorized the creation of the derivative work, that derivative work is not infringing, but the derivative work's owner's right "may not exceed the specific purpose for which permission was granted." *Gilliam v. ABC*, 538 F.2d 14, 20-21 (2d Cir. 1976). Thus a photographer who takes a photograph of a sculpture at the behest of the sculptor is not infringing the sculptor's copyright, but "that does not mean that [the photographer's] copyrights in the photographs give him the unrestricted right to use and license them as he wishes without regard to [the sculptor's] copyrights in the sculptures those photographs depict." *Cooley v. Penguin Grp. (USA), Inc.*, 31 F. Supp. 3d 599, 608 (S.D.N.Y. 2014).

Indeed, in that case, since the photographer's "original contributions to the photographs are inextricably intertwined with …[the] sculptures, [the photographer's] ability to exploit his own rights to the photographs without [the sculptor's] consent is virtually nonexistent." . Arguably that is the case here, but the Court need not decide that to dispose of the case. Assuming Grecco retained any residual right to exploit the Photographs, his rights would not extend to interfering with the promotional purpose for which the photographs were created. *Gilliam*, 538 F.2d at 20-21; SS 18.

### B.    In any event, Grecco expressly and impliedly licensed the media to use the photographs in editorial commentary on the underlying shows

Quite apart from derivative nature of the Photographs, Grecco expressly and impliedly licensed the promotional use of the Photographs. Where the copyright holder "created a work at [another's] request and handed it over, intending that defendant copy and distribute it," he impliedly licenses that person to use the copyrighted work in the intended manner. *Effects Assocs. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990). "[W]here a licensor grants to a licensee the unrestricted right to sublicense and permit others to use a copyrighted work, a sublicense may be implied by the conduct of the sublicensor and sublicensee." *Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d

Joshua Koltun ATTORNEY

56, 64 (1st Cir. 2020).  A nonexclusive license can be shown by "nonwritten evidence--such as testimony, course of conduct, and custom and practice."  *Foad Consulting Grp., Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 825-28 (9th Cir. 2001).[7]

Here, Grecco both impliedly and expressly licensed the Studios to disseminate these promotional photographs to the media.  SS 22-41; 43-45.  The custom and practice in the industry indicated that promotional (or "publicity") photographs would be disseminated widely in the media so that the media would use them in editorial commentary on the shows.  SS 8-16.[8]  Grecco knew that Studios were distributing these photographs to the media, among other things through press kits.  SS 44.   Indeed he knew that the Studios were claiming copyright ownership in his photographs, and did not object.  SS 45.

Livingly's editorial use of these promotional Photographs squarely falls within the intended use of these photographs.  *See Viacom Int'l v. Tandem Prods.*, 368 F. Supp. 1264, 1275 (S.D.N.Y. 1974) (a license will be construed as including such rights as the licensor knows the licensee believes it has); *Settel v. Office Appliance Co.*, 1959 U.S. Dist. LEXIS 4260, at *4-6, 8-9 (N.D. Ill. June 15, 1959) (license to publish article in magazine implied right to reprint the articles in booklet).[9]  SS 44, 45, 54.

_____

[7]"[I]n cases where only the scope of the license is at issue, the copyright owner bears the burden of proving that the defendant's copying was unauthorized." *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995) (citation omitted)).

[8]*Ermolieff v. R. K. O. Radio Pictures*, 19 Cal. 2d 543, 549-50 (1942)(entertainment industry custom is a part of the contract in aid of its correct interpretation"); *Howard Entm't, Inc. v. Kudrow*, 208 Cal. App. 4th 1102, 1114 (2012)(same)*Watson Land Co. v. Rio Grande Oil Co.*, 61 Cal. App. 2d 269, 271-72, 142 P.2d 950, 951-52 (1943) (anyone engaged in an industry is deemed aware of practices of common knowledge)).

[9]Grecco's contemporaneous knowledge and conduct is relevant because this Court must determine the intentions of the parties, which is an objective test. *Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 68-69 (2017).  Grecco's "undisclosed intent or understanding is irrelevant" to interpreting his license. *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003).  The parties' course of

Joshua Koltun ATTORNEY

Grecco's license – like all copyright licenses - contained the implicit requirement that he "do nothing whatsoever that would injure or destroy the value" of the license he had granted to the studios. *County of Ventura v. Blackburn*, 362 F.2d 515, 518 (9th Cir. 1966). A license cannot be reasonably construed as granting the licensor the "unreasonable advantage" of later allowing the licensor to "destroy the fruits of the agreement." *Zim v. W. Publ'g Co.*, 573 F.2d 1318, 1324-25 (5th Cir. 1978); *accord Budco, Inc. v. The Big Fights, Inc.*, 594 F.2d 900, 902 (2d Cir. 1979); SS18 (expert opinion that Grecco's lawsuits undermine the ability of the entertainment industry's ability to promote their shows through promotional photographs).

### C.   Grecco's "assignment invoices" neither negate nor limit the scope of the license to the media to use the promotional photographs

Grecco claims here, as he has claimed historically, that he licensed the *X-Files* and Xena photographs to the Studios pursuant to his "assignment invoices." SS 27. That unchallenged factual representation was the basis of the Court's opinion in *Michael Grecco Photography, Inc. v. Everett Collection, Inc.,* 589 F. Supp. 2d 375, 379-80 (S.D.N.Y. 2008).[10]

---

performance immediately after executing the contract is evidence of the parties' intentions. *Wind Dancer,* 10 Cal.App.5th at 72; Cal. Civil Code § 1647; Restatement of Contracts 2d § 202(4). Even if it were true that Grecco harbored any undisclosed belief that his license did not allow such use, his failure to act on that belief is what matters legally. *Oceanside 84, Ltd. v. Fid. Fed. Bank*, 56 Cal. App. 4th 1441, 1449-51 (1997) (contemporary acquiescence is evidence of parties' intentions).; *S. Cal. Edison Co. v. Superior Court*, 37 Cal.App.4th 839, 851 (1995) (conduct of one party to the contract is evidence of both parties' intentions) *See also* Civil Code § 1649 (contract will be interpreted in the sense that promisor believed, at the time, that promisee understood the contract).

[10] The *Everett Collection* case involved a stock photography company purporting to license Grecco's photographs for a fee. *Id.* at 377-78. It did not involve the media using promotional photographs to illustrate editorial commentary on the shows. The question of the scope of the promotional license was thus never presented. Moreover the photographs at issue in that case were not all promotional photographs. Nevertheless, and significantly, the Court held that there was a question of fact whether

- 14 -

That factual representation was misleading, however.  First, with respect to Fox, any putative license in Grecco's terms and conditions was supplanted by the 1994 Agreement, and later by the 2019 Agreement, which granted Fox a publicity license to all of his *X-Files* Photographs.  SS 35, 43.

Thus the "assignment invoices" are relevant, at most, only to the Photograph 4, the Xena photograph.  But Grecco's reliance on that "assignment invoice" is misplaced.

First, these "assignment invoices" were ***not*** invoices to the studios – as represented in the *Everett* case -- but rather Grecco's invoices to his agent, Ms. Hamilton.  SS 27.   Hamilton did not necessarily use the language on the face of her invoices to the studios that Grecco used in his invoices to her.  SS 28, 29.  Moreover, there is no admissible evidence as to whether Hamilton's staff actually included the boilerplate fine print on the back of the invoice when they faxed her invoices to the studios.  SS 30.  Assuming they did so, it is not at all clear that the fine print would have been legible.  SS 31.

Assuming arguendo that the fine print was sent and was legible, it would not negate the general promotional license to the photographs.  The assignment invoice would only have been sent to MCA after it had commissioned the photographs and set aside valuable time to have its lead actress photographed on set.  As then-Judge Sotomayor explained in an analogous circumstance, a software company that allows people to download its software cannot enforce the purported "terms" of a software license unless it can show that a "reasonably prudent" person would have known or learned of the existence of the terms before responding to the invitation to download the software; the bare act of downloading the software cannot be deemed to manifest assent to the terms of the license.  *Specht v. Netscape Communs. Corp.*, 306 F.3d 17, 20-21, 28-30 (2d Cir. 2002) (applying California contract law); *accord Nguyen v. Barnes & Noble Inc., 76*3 F.3d 1171, 1175-77 (9th Cir. 2014).

---

Grecco had granted an exclusive license to the studios, reserving for himself only the right to use the photographs to promote his own photography business.  *Id.,* at 383-84.

The [purported] inclusion of the fine-print terms on after-the-fact invoices cannot have been sufficient to negate the Studio's understanding that it had commissioned promotional photographs precisely so that they would be widely disseminated to the media to maximize publicity for the show.   Indeed, the invoice language that Grecco relied upon in the *Everett Collection* case, and produced in this action, were far broader than promotional: "***unlimited usage rights*** are granted to the client."  SS. 33 (emphasis added); *Everett Collection,* 589 F.Supp.2d at 380.[11]

There was no indication that this very broad grant of rights would be negated by fine print "terms and conditions."  Indeed, it is impossible to reconcile the "terms and conditions" with the promotional nature of these photographs.   For example, paragraph 3 states:

> **Scope of License:**  Rights are granted for **one use only (excluding buy outs).** … Materials may not be reproduced, copied, projected, cannibalized or otherwise used without express written consent.

SS 34.  But it is in the very nature of a promotional license – let alone an "unlimited usage" license -- that the photograph will be "reproduced," among other things, in press kits, and widely disseminated to the media, who would themselves be expected to reproduce the photographs in their editorial content.  Assuming MCA were aware of the putative "terms and conditions" fine print, it would have been justified in assuming that this boilerplate language only applied to "editorial" licenses, not to an expressly "unlimited" license. [12]  *Cf. Live Face on Web, LLC v. Cremation Soc'y of Ill., Inc.*, 2019 U.S. Dist. LEXIS 82660, at *2-3, *10-12 (E.D. Pa. May 16, 2019) (terms of end-user license agreement that contradicted consumer expectations and understandings by

---

[11] Indeed, MCA used the photograph, among other things, as a cover for a boxed set of DVDs for the Xena series.  SS 17.

[12] The terms and conditions that Grecco contends were sent by Hamilton in 1993 to 1997 were the same, whether the use was for a single editorial use, as by USA Weekend or a single advertising use, as by Delphi Internet, or a publicity use, as for photographs 2, 3, or 4.  SS 33.

Joshua Koltun  ATTORNEY

- 16 -

restricting software use to "one URL" supported claim of violation of California Unfair Competition Law).

The "assignment invoice" to Photograph 4 thus cannot negate Grecco's contemporaneous conduct, which shows that he fully understood and acquiesced in the general custom and practice of distributing promotional photographs to the media to maximize publicity to promote their shows. *Foad Consulting Grp.* 270 F.3d 821 at 28.

## II.     Livingly's use of the promotional Photographs in editorial commentary on the underlying television shows was fair use

Grecco contends that the license to the media to use promotional photographs in connection with the underlying shows is limited.  For example, he contends that the studios only had the right to send the photographs to "credible approved editorial outlets," and that the studio publicity departments would "more or less had to approve the content of [an] article … before it was published"[13]   Assuming, *arguendo*, that Grecco were able to support such contentions with evidence of the custom and practice in the industry, Livingly's use was fair use.

The fair use analysis requires the Court to apply an "equitable rule of reason." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 447-50 (1984).  "The fair use doctrine thus 'permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994) (internal citation omitted)).  The Copyright Act lists four statutory fair use factors (discussed below), but they are "illustrative and not limitative," and should not be "treated in isolation, one from another," but rather "[a]ll are to be explored, and the results weighed together, in light of the purposes of copyright." *Id.* at 577-78.

---

[13] Depo. (Koltun Decl., Exh. A) 149:1-9, 183:4-20.

- 17 -

Joshua Koltun ATTORNEY

**A.** **The "purpose and character" of Livingly's use of the photograph, to illustrate editorial commentary on the underlying television shows – strongly favors a determination of fair use**

The first factor requires the Court to consider the "purpose and character" of Livingly's use of the photographs.  17 U.S.C. § 107. The copyright statute singles out for protection "purposes such as criticism, comment, [and] news reporting."  *Id.* Assuming *arguendo* that the license was limited to "friendly" media or "favorable" commentary, the fair use doctrine would abrogate any such limitations.  Thus, for example, in *Dhillon v. Doe*, a politician had commissioned a photograph of herself in order to use in her campaign, and owned the copyright in the photograph.  *Id.,* 2014 U.S. Dist. LEXIS 24676, at *13-15 (N.D. Cal.).  Defendant, without a license from the politician, had used the photograph in article that criticized her.  *Id.* "Such a use is precisely what the Copyright Act envisions as a paradigmatic fair use." *Id.* at *15. Similarly, where a magazine had run a satirical scatological article ridiculing a prominent pastor/political figure, it was fair use for the pastor to use copies of the article in fundraising efforts for his political organization.  *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1153 (9th Cir. 1986).  The first factor strongly favors fair use.

**B.** **Since the promotional Photographs are derivative of the Studio's television shows and specifically created to be published by the media, the "nature of the copyrighted work" favors fair use**

The second factor requires the court to consider "the nature of the copyrighted work." 17 U.S.C. § 107.  Some works, such as fictional, creative works, are closer to the core of intended copyright protection than primarily factual works.  *Campbell*, 510 U.S. at 586.   Photographs that depict factual events are more conducive to fair use than photographs that "comprise the photographer's artistic product."  *Elvis Presley Enters. v. Passport Video*, 349 F.3d 622, 629-30 (9th Cir. 2003).

Here, as discussed in section I.A., the Photographs are derivative works, depicting fictional characters in a television show, the copyright to which is owned by

- 18 -

the Studio.  Thus, while the Photograph is, in that sense, "creative," the fictional characters at issue are not Grecco's creation.   Thus, even if we assume that Grecco added some element of originality to the photograph (as does a photographer of factual events), one cannot attribute to Grecco the creativity that was involved in creating the underlying television show and the characters depicted in the photograph.

Moreover, one must also consider the promotional nature of the copyrighted works here.  Where a work is created with the intention that it be disseminated and used, that counsels in favor of a finding of fair use.  *Am. Inst. of Architects v. Fenichel*, 41 F. Supp. 146, 147 (S.D.N.Y. 1941).[14]  The second factor favors fair use.

### C.   Since the "amount and substantiality of the portion" of the work that Livingly used was appropriate to the purpose for which Livingly did so, this factor favors fair use.

The third factor requires the Court to consider the "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107. This is not a quantitative inquiry, but rather is aimed at determining whether the amount taken was "reasonable in relation to the purpose of the copying."  *Campbell*, 510 U.S. at 586-88.  Thus, for example, it may be permissible to take the "heart" of a copyrighted work if to do so is necessary for the purpose of parodying the work.  *Id.* . Depending on the nature of the use, the wholesale copying of the entire work may be consistent with fair use.  *Sony Corp.*, 464 U.S. at 449-50.

Here, in light of the promotional nature of the Photographs, the portion of the photographs that Livingly used to illustrate its commentary on the underlying television shows was entirely reasonable.  The third factor favors fair use.

---

[14] By contrast, where a work has never been published, that counsels against fair use. *Harper & Row v. Nation Enters.* 471 U.S. 539, 550-51 (1985).

- 19 -

Joshua Koltun  ATTORNEY

### D. Grecco cannot rely on circular reasoning to create an imaginary market for editorial licenses to these promotional photographs; thus the "effect of the use upon the potential market" favors fair use.

The fourth factor requires the Court to consider "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107.  The market analysis "requires a balancing of the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) (internal citation and quotation marks omitted).   Here, the purpose of promotional photographs is to benefit the market for the underlying television shows, not to create a market for the photographs themselves.  The photographs were designed to be disseminated to the media without charge, precisely to encourage the media use them to illustrate editorial commentary on the television shows.  SS 8-12.

The fourth factor does not mean that the copyright holder can defeat fair use simply by positing a desire to license the use at issue.  It "is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the very use at bar."  *Id.* at 614 (quoting 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.05[A][4] (2005)).  The copyright owner must show that there are "traditional, reasonable, or likely to be developed markets" that would be impaired by the use.  *Id.*

Even if we assume that Grecco retained some residual right to exploit the photographs, that doesn't mean that he can posit an imaginary market whereby media commenting on television shows must pay a fee to license promotional photographs to illustrate these articles.  *Id.* at 615 (copyright holder cannot preempt fair use by claiming to have developed a market for licensing "parody" or "news reporting").

Grecco's "licensing" business consists entirely of settlements of litigation or threatened litigation.  SS. 50.  Indeed, Grecco has designated his dealings with Fox to be a "trade secrets" – manifestly because disclosure of the true facts concerning the

- 20 -

Joshua Koltun ATTORNEY

promotional licenses to these Photographs would damage his business model, which depends on his ability to extract nuisance settlements.  SS 52.  To deem that litigation business as constituting a "market" for fair use purposes would be precisely the circular reasoning that the law forbids.[15]  The fourth factor favors a finding of fair use.

**III.     *Grecco's claims regarding Photographs 1 and 3 are barred by the Statute of Limitations, because Livingly's articles were openly available on the internet for more than three years; Grecco cannot establish when he first discovered them, let alone that he could not reasonably could have discovered them earlier***

Grecco did not file this action until more than three years after Livingly posted on the internet the Articles that used Photographs 1 and 3.  SS 53.  Grecco contends that its delay was reasonable because he "had no reason to know" of Livingly's use of the images, because Grecco "availed himself of image search technologies over the years to police its work, and said technologies had not previously revealed" Livingly's articles.  D.E. 23 at 2:5-14 (Rule 26(f) Report).

Grecco's contention assumes that the Ninth Circuit will continue to follow the discovery rule of  *Polar Bear Prods., Inc. v. Timex Corp.*, that plaintiff must thus show, first, that he had not discovered the infringement, and second, that his failure to do so was reasonable "under the circumstances." *Id.,* 384 F.3d 700, 706-07 (9th Cir. 2004). The burden is on the plaintiff invoking the discovery rule. *Hinton v. Nmi Pac. Enters.*, 5 F.3d 391, 395 (9th Cir. 1993).

It is doubtful that the Ninth Circuit will continue to apply the discovery rule.  In *Mangum v. Action Collection Service*, the Ninth Circuit acknowledged that the Supreme Court has cast considerable doubt on its general application of a discovery rule to federal statutes, but indicated that it would continue, in the absence of a clear

---

[15]   *Cf. Philpot v. L.M. Communs. II of S.C.*, 2020 U.S. Dist. LEXIS 85901, at \*6 (E.D. Ky. May 15, 2020) (where successful copyright plaintiff was in the business of litigation and obtaining nuisance settlements, which he characterized as "licenses," rather than genuinely licensing his work, attorneys fees were not awarded because they would not serve the interests of the copyright law).

directive from the Supreme Court.  *Id.*, 575 F.3d 935, 941 (9th Cir. 2009).

Subsequently, however, in *Rotkiske v. Klemm*, the Supreme Court specifically

disapproved *Magnum,* holding that discovery rules were not the general default for

federal statutes, and that between two plausible constructions the "standard rule" is that

the limitation runs from the time the cause of action accrues.  *Id.* 140 S. Ct. 355, 359-

360 (2019).  Similarly, in *Gabelli v. SEC,* the Court held that "the standard rule is that a

claim accrues when the plaintiff has a complete and present cause of action."  *Id.*, 568

U.S. 442, 448 (2013)(citations and quotation marks omitted).  Interpreting the SEC

statute, which, like the Copyright statute, required actions to be commenced within [a

specified time] from the date when the claim first accrued," the Supreme Court

concluded that the discovery rule would only apply where a showing was made of

fraudulent concealment.   *Id.* at 445, 447-51; *compare* 17 U.S.C. § 507(b) ("No civil

action shall be maintained [under Copyright Act] unless it is commenced within three

years after the claim accrued.")

There is certainly no evidence of fraudulent concealment here.  Moreover, even

if the discovery rule were applicable, Grecco has failed to establish when he first

discovered Livingly's publication of Photographs 1 and 3, let alone that he could not

reasonably have discovered them earlier.  Until 2018, he employed a reverse-image-

search vendor, ImageRights, to find instances of infringement of his "classic images,"

including the four at issue here, and he simply does not know whether ImageRights

discovered the Livingly's posting of the images or not. SS 59.   Thus the claim is time-

barred as to those Photographs.

### IV.    *Assuming Livingly were liable for infringement, Grecco is only entitled to minimal damages, since Livingly had no reason to know of his claim that its use of these promotional photographs constituted infringement*

Assuming Livingly were liable for copyright infringement for any of the

Photographs, this Court should award only minimal damages.  No statutory damages

Joshua Koltun ATTORNEY

are available for Subject Photograph 3, as to which Grecco only registered the copyright after Livingly first published the photograph.  SS 46, 53; 17 U.S.C. ¶ 412.[16]

As soon as Livingly learned that Grecco was asserting claims to *one X-Files* photograph, it removed ***all*** photographs of the *X-Files* that it could find, replacing them with screenshots from the actual show.  SS 62, 63.  Livingly inadvertently failed to discover certain uses, but removed them as soon as Grecco brought them to its attention.  SS 64.

Under these circumstances, Livingly's infringement of the Photographs cannot be deemed willful.  On the contrary, Livingly's conduct was entirely innocent.  If the infringer "was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200."  17 U.S.C. § 504 (c) (2).  As the House Report to this "innocent infringer" statutory provision explained, it is designed "to protect against unwarranted liability in cases of occasional or isolated innocent infringement, and it offers adequate insulation to users, such as broadcasters and newspaper publishers, who are particularly vulnerable to this type of infringement suit."

Livingly's staff believed, and have every reason to to assume, that the promotional Photographs were owned by the studios, and at a very minimum, as with all such photographs, were subject to the general license to the media to use such promotional photographs.  SS 55, *cf. County of Ventura*, 362 F.2d at 521-22 (no damages where copyright holder had licensed the right to give away the work for free).

Certainly the media should not be expected, as Grecco insists, to research the precise contractual arrangements underlying each self-evidently promotional

---

[16] The maximum possible Livingly revenue attributable to the photograph is $520. SS 56.  Indeed, the maximum revenue attributable to all four photographs is $1033.  *Id.*  And Grecco cannot show any lost licensing income.  SS 50.

Joshua Koltun ATTORNEY

photograph – let alone where – as here – the true contractual arrangements with the studios have been deliberately kept secret.[17]

## *CONCLUSION*

Grecco's "licensing" business, has, for years, extracted nuisance settlements from media companies who had every right to use these promotional photographs to illustrate commentary on the underlying shows.  His business model is premised on the assumption that media defendants will settle rather than undertake the expense to obtain an adjudication of those rights.  Grecco's lawsuits have the improper chilling effect of inhibiting media 's use of promotional photographs for their intended purpose, undermining the ability of the entire entertainment industry to promote its copyrighted shows.  SS 18.   Livingly respectfully requests this Court to grant it summary judgment.

Dated:  March 1, 2021

_____\s_____
Joshua Koltun
Attorney for Defendant and
Counterclaimant Livingly Media, Inc.

_____

[17] Grecco testified that even though Fox had labeled his promotional photographs with its own copyright notice, it would not be reasonable for the media to believe that Fox actually owned the copyrights, "because … anyone sophisticated enough would realize that you couldn't count on the specific deal or details of any arrangement between an artist and the network without knowing them, but that a network like Fox stamped everything 'Copyright Fox.'  Depo. (Koltun Decl., Exh. A) at 185:10-186:17.

Joshua Koltun ATTORNEY