Joshua Koltun (Bar No. 173040)
Attorney
1 Sansome Street
Suite 3500, No. 500
San Francisco, California  94104
Telephone:  415.680.3410
Facsimile:  866.462.5959
joshua@koltunattorney.com

Attorney for Defendant and Counterclaimant
Livingly Media, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

MICHAEL GRECCO PRODUCTIONS, )
INC. d/b/a "Michael Grecco )
Photography," a California corporation, )
)
                    Plaintiff, )
)
          v. )
)
LIVINGLY MEDIA, INC., a Delaware )
Corporation; and DOES 1-10, )
)
                    Defendants. )
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 2:20-c-00151 DSF-JC

OPPOSITION OF LIVINGLY
MEDIA, INC. TO MICHAEL
GRECCO PRODUCTIONS, INC.
MOTION FOR SUMMARY
ADJUDICATION

*Hearing:*
Date: April 5, 2021
Time:  1:30 pm___
Court: [Zoom Webinar]
Judge: The Hon. Dale S. Fischer

*Filed Herewith:*
Statement of Genuine Disputes
Memorandum of Evidentiary
Objections
[Proposed] Order

*Relied Upon Herein* (*Filed with
Livingly Motion for Summary
Judgment)*
Declarations of Joshua Koltun
(Application to File Under Seal
pending [DE 42]), Erica Carter (DE
35); Richard Licata (DE 36), ,
Deanna Shin (DE 37), Areeba Abid
(D.E. 38), Lani Conway (DE 39),
Kimia Madani (DE 40); Cecily
Trowbridge (DE 41).

Joshua Koltun ATTORNEY

1
2
3

TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................iii

INTRODUCTION ............................................................................................. 1

MATERIAL FACTS .......................................................................................... 2

A. This case involves four promotional photographs for television shows .............. 2

B. The purpose of promotional photographs is and was, obviously, to promote the television shows; the custom and practice in the industry is to disseminate the photographs as widely as possible in the media to maximize publicity .......... 3

C. The "Contracts" submitted by Grecco are not operative agreements ................. 4

D. Grecco knew, and acquiesced, in the distribution by the Studios of these promotional Photographs so that any media who "came into possession" of the Photographs would be encouraged to use them in connection with editorial mention of the shows .......................................................... 8

E. Many years after Grecco took the Photographs, he registered them with the Copyright Office – without disclosing that they were derivative works – and began his "licensing" business, which consists entirely of settling infringement claims with retroactive "licenses" .............................................. 8

F. Livingly used the promotional photographs in editorial comment on the underlying television shows .............................................................. 9

G. Grecco has for many years conducted reverse image searches for uses of the Photographs, and does not know when his agents first discovered Livingly's use of the Photographs ................................................................... 10

H. When Grecco sent it cease and desist letters, Livingly promptly took down the Photographs and replaced them with screenshots ......................................... 11

ARGUMENT .................................................................................................. 11

I.    The Photographs were expressly created for the purpose of promoting the X-Files and Xena, Warrior Princess shows in the media; Livingly's use was within the scope of the license to do so .......................................................... 11

A. The Photographs were derivative works of the copyrighted television shows; any rights Grecco has in the Photographs are subject to the studio's promotional purpose in permitting the creation of the Photographs .............. 11

Livingly Opp. To Grecco Motion Summary Adjudication                                    2:20-cv-00151 DSF-JC

Joshua Koltun ATTORNEY

B. Grecco has the burden to show Livingly exceeded the scope of the promotional license to these photographs..........................................................................13

C. Quite apart from the promotional nature of these derivative works, Grecco expressly and impliedly licensed the media to use the photographs in editorial comment on the underlying shows .....................................................14

D. Grecco's "assignment invoices" neither negate nor limit the scope of the license to the media to use the promotional photographs ..........................................16

II.   Livingly's use of the promotional Photographs in editorial comment on the underlying television shows was fair use ..............................................................18

A. The "purpose and character" of Livingly's use of the photograph, to illustrate editorial comment on the underlying television shows – strongly favors a determination of fair use ...............................................................................19

B. Since the promotional Photographs are derivative of the Studio's television shows and specifically created to be published by the media, the "nature of the copyrighted work" favors fair use..............................................................20

C. Since the "amount and substantiality of the portion" of the work that Livingly used was appropriate to the purpose for which Livingly did so, this factor favors fair use. .....................................................................................21

D. Grecco cannot rely on circular reasoning to create an imaginary market for editorial licenses to these promotional photographs; thus the "effect of the use upon the potential market" favors fair use..............................................21

III.   Grecco's claims regarding Photographs 1 and 3 are barred by the Statute of Limitations, because Livingly's articles were openly available on the internet for more than three years; Grecco has not shown when he first discovered them, let alone that he could not reasonably could have discovered them earlier .............23

IV.   If Livingly were liable for infringement, it was not reckless – indeed, not even negligent -- for it to have assumed that these promotional Photographs may permissibly be used with editorial comment on the shows they depicted ...........24

CONCLUSION.............................................................................................25

Joshua Koltun ATTORNEY

- ii -

### TABLE OF AUTHORITIES

**Cases**

*Am. Inst. of Architects v. Fenichel*, 41 F. Supp. 146, 147 (S.D.N.Y. 1941)..................21

*Anderson v. Stallone*, 1989 U.S. Dist. LEXIS 11109, at \*24-25 (C.D. Cal. Apr. 25, 1989)........................................................................................................................12

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006)...22

*Bourne v. Walt Disney Co.*, 68 F.3d 621, 630-31 (2d Cir. 1995)................................13

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994) .................19, 20, 21

*Cooley v. Penguin Grp. (USA), Inc.*, 31 F. Supp. 3d 599, 608 (S.D.N.Y. 2014)...........13

*Dhillon v. Doe*, 2014 U.S. Dist. LEXIS 24676, at \*13-15 (N.D. Cal.). ........................19

*Effects Assocs. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990)..................................14

*Elvis Presley Enters. v. Passport Video*, 349 F.3d 622, 629-30 (9th Cir. 2003)............20

*Ermolieff v. R. K. O. Radio Pictures*, 19 Cal. 2d 543, 549-50 (1942)............................14

*Foad Consulting Grp., Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 825-28 (9th Cir. 2001)...............................................................................................................14, 18

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003) ...............................................15

*Gabelli v. SEC*, 568 U.S. 442, 448 (2013).......................................................................23

*Gilliam v. ABC*, 538 F.2d 14, 20-21 (2d Cir. 1976). ...............................................12, 13

*Hinton v. Nmi Pac. Enters.*, 5 F.3d 391, 395 (9th Cir. 1993)........................................23

*Howard Entm't, Inc. v. Kudrow*, 208 Cal. App. 4th 1102, 1114 (2012) ......................14

*Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1153 (9th Cir. 1986).20

*Live Face on Web, LLC v. Cremation Soc'y of Ill., Inc.*, 2019 U.S. Dist. LEXIS 82660, at \*2-3, \*10-12 (E.D. Pa. May 16, 2019).........................................................18

*Mangum v. Action Collection Service*, 575 F.3d 935, 941 (9th Cir. 2009)...................23

*Michael Grecco Photography, Inc. v. Everett Collection, Inc.,* 589 F. Supp. 2d 375, 379-80 (S.D.N.Y. 2008). ...................................................................................5, 16

*Miniace v. Pac. Mar. Ass'n*, 2006 U.S. Dist. LEXIS 13726, at \*8 (N.D. Cal., May 18)24

*Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1175-77 (9th Cir. 2014) ...................17

*Oceanside 84, Ltd. v. Fid. Fed. Bank*, 56 Cal. App. 4th 1441, 1449-51 (1997) ...........15

*Philpot v. L.M. Communs. II of S.C.*, 2020 U.S. Dist. LEXIS 85901, at \*6 (E.D. Ky. May 15, 2020) ...........................................................................................................22

*Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56, 64 (1st Cir. 2020) ..........14

*Polar Bear Prods., Inc. v. Timex Corp.,* 384 F.3d 700, 706-07 (9th Cir. 2004) ............23

*Rotkiske v. Klemm*, 140 S. Ct. 355, 359-360 (2019) .....................................................23

*S. Cal. Edison Co. v. Superior Court*, 37 Cal.App.4th 839, 851 (1995) .......................15

*Settel v. Office Appliance Co.*, 1959 U.S. Dist. LEXIS 4260, at \*4-6, 8-9 (N.D. Ill. June 15, 1959)...................................................................................................................15

*Smith v. Barnesandnoble.com, LLC*, 839 F.3d 163, 166-68 (2d Cir. 2016)..................13

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 447-50 (1984) .........19

*Specht v. Netscape Communs. Corp.*, 306 F.3d 17, 20-21, 28-30 (2d Cir. 2002)..........17

Joshua Koltun   ATTORNEY

*Stewart v. Abend*, 495 U.S. 207, 221-36 (1990). .......................................................... 12

*Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir. 2014) ............ 20

*Toho Co., Ltd. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1215-16 (C.D. Cal. 1998) .......................................................................................................................... 12

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 38-41 (2d Cir. 2019) .......................................................................................................................... 13

*Viacom Int'l v. Tandem Prods.*, 368 F. Supp. 1264, 1275 (S.D.N.Y. 1974) ................. 15

*Watson Land Co. v. Rio Grande Oil Co.*, 61 Cal. App. 2d 269, 271-72, 142 P.2d 950, 951-52 ....................................................................................................................... 14

*Wendt v. Host Int'l, Inc.*, 197 F.3d 1284, 1286 (9th Cir. 1999) ..................................... 12

*Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 68-69 (2017). 15

**Statutes**

17 U.S.C. § 107 .................................................................................................. 19, 20, 21

17 U.S.C. § 507(b) ....................................................................................................... 23

Cal. Civil Code § 1647 ................................................................................................. 15

Cal. Civil Code  § 1649 ................................................................................................ 15

**Other Authorities**

Restatement 2d of Agency § 277 ................................................................................ 24

Restatement of Contracts 2d  § 202(4) ....................................................................... 15

Joshua Koltun ATTORNEY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joshua Koltun ATTORNEY

### *INTRODUCTION*

The photographs in question ("Photographs") are of the actors David Duchovny and Gillian Anderson in their roles as Mulder and Scully in the television show *The X-Files,* and of Lucy Lawless in the title role of the show *Xena, Warrior Princess.*  SUF 3, 7, 9, 11. For that reason, Livingly's authors decided that the photographs must be promotional photographs and thus that Livingly was entitled to use the photographs in editorial content referencing those television shows.  SUF 15, SGD 74.

Grecco contends that this was "reckless." MSJ at 2:26-28, 3:13.

But Livingly was not mistaken.  There is substantial evidence – indeed, no genuine dispute -- that these photographs *are* promotional.  SGD 20, 22.

A fundamental flaw in Grecco's motion is that it fails to recognize the highly restricted nature of his copyright in the Photographs.  Since the Photographs depict actors playing characters in copyrighted television shows, the Photographs are, as a matter of law, derivative works.  As such, any rights Grecco may have in the Photographs are limited by the promotional purpose for which the studios permitted Grecco to take the Photographs.  Assuming *arguendo* that Grecco has any right to exploit the Photographs at all, he has no right to try to prevent media companies such as Livingly from using the photographs for their intended purpose, to illustrate editorial comment on the shows.

Moreover, quite apart from the restrictive nature of his rights, he expressly and impliedly granted the Studios a promotional license to the Photographs.  The custom and practice in the industry is that promotional photographs are distributed as widely as possible to maximize publicity to the shows.  Grecco knew this; indeed he was specifically informed that any media that "came into possession" of his photographs were permitted to use them in editorial discussion of the shows, and did not object.

Assuming *arguendo* that Livingly's use were outside the scope of the promotional license for these Photographs, any such limitation would be abrogated by the fair use doctrine, which is designed to provide more freedom to editorial comment

than the copyright holder might permit. Grecco's argument that Livingly's use has harmed the market for his photographs is circular. There is no market for the licensing of promotional photographs to the media companies that wish to comment on the shows. Grecco's "licensing" business consists entirely of extracting nuisance settlements in the form of *retroactive* licenses for putative infringements.

Livingly's Articles illustrated with Photographs 1 and 3 were openly published on its website more than three years before Grecco filed suit. Grecco contends that the the statute of limitations is tolled. He states that he first learned of Livingly's use on December 24, 2019. That is plainly false. His lawyers sent Livingly cease and desist letters in February and April 2019, and Livingly promptly removed them. SGD 84, SUF 1. Moreover, Grecco's burden is to show not only he didn't know of the publication, but that he could not reasonably have discovered it. He has not shown when his law firm or the other vendors who he engaged to look for infringement first discovered Livingly's use, let alone that they could not reasonably have discovered it earlier. Grecco cannot hide behind a claim of personal ignorance; the knowledge and reasonableness of his agents is imputed to him. Those claims are time-barred.

For the most part, Livingly does not dispute the facts on which Grecco relies, with the exception of the "contracts" that he has attached to this motion, which were not operative agreements. SGD 1-19. Livingly relies on the additional material facts it presents on this motion. SGD 20-85.These are the same facts that Livingly presented on its summary judgment motion, as to which Livingly contends there is no genuine dispute. At a minimum, Livingly contends that this evidence is sufficient to raise genuine issues of fact that defeat this motion.

## *MATERIAL FACTS*

### *A.*    *This case involves four promotional photographs for television shows*

This case involves four promotional still photographs ("Photographs") for television shows. SGD 20. Photographs 1, 2 and 3 depict the actors David Duchovny and Gillian Anderson in their respective roles as Agents Mulder and Scully in the *X-*

Joshua Koltun ATTORNEY

*Files*, and Photograph 4 depicts the actress Lucy Lawless in the title role of *Xena, Warrior Princess.*  SUF 3, 7, 9, 11, SGD 21.  The terms "promotional [still] photograph" and "publicity [still] photograph" are interchangeable.  SGD 22.  "Editorial" use means a direct license to a media outlet to use the photograph, whereas "promotional" or "publicity" use means that the studio is licensed to distribute the photograph to the media so that the media might use the photograph in editorial use.  SGD 23.

The Photographs were taken by Michael Grecco, who operates through Michael Grecco Productions, Inc., plaintiff herein ("Grecco").  SGD 24.  Grecco does not own any copyright interest the underlying television shows.  SGD 25.

### B.   *The purpose of promotional photographs is, obviously, to promote the television shows; the custom and practice in the industry is to disseminate the photographs as widely as possible in the media to maximize publicity*

The purpose of a promotional still photograph of a television show is, obviously, to promote that television show.  In the entertainment industry, the custom and practice was as follows.  Promotional photographs were distributed to the media precisely so that they would be published in editorial content concerning the television show.  SGD 27.  The photographs would usually, but not always, be accompanied by language affirmatively indicating that permission was granted to the media (not to a specific licensee) to use the photographs in editorial content relating to the television shows.  SGD 28, 35.  The purpose of the permissions language was to encourage such use by the media; in the absence of such language the promotional purpose of the images was nevertheless understood in the industry.  SGD 29[1]  Promotional photographs were

---

[1]Fox has not retained copies of its old press kits, but *X-Files* press kits purchased on the memorabilia market include Grecco's black and white promotional photographs with permissions language on the bottom, and color transparencies (slides) that sometimes have permissions language, sometimes only the Fox copyright notice, and sometimes bear no language at all.  SGD 33.  Among the press kits that were located was one that contained Photograph 2. SGD 34.

circulated, for example via press kits and direct communications with journalists, as widely as possible; the aim was to maximize publicity for the show.  SGD 30.   Access to photographs was not conditioned on the media giving favorable coverage.  SGD 31.  Promotional photographs had no expiration dates.  SGD 32.

### C.   The "contracts" submitted by Grecco are not operative agreements

The motion obliquely refers to the "client" that engaged Grecco to take Photograph 1, and omits to discuss the circumstances under which he was engaged to take the other Photographs.  MSJ 1:24-2:20, SUF 4, 5, 7. 9, 11.  Grecco's declaration attaches two purported "contracts," relating to Photographs 1 and 3.  Grecco Declaration, ¶¶ 2 11, Exh. 2 & 9.  As we will explain, these are not actually operative agreements.  The true facts (which Grecco considers to be "trade secrets") concerning the creation of the Photographs are as follows.

Fox and MCA, [2] the studios that owned the copyrights in the television shows ("Studios") arranged directly with Grecco to take Photographs 2, 3 and 4, and granted Grecco permission to take Photograph 1.  SGD 38-40.  Grecco licensed the Photographs to the Studios.  SGD 60.

Specifically, Photographs 2 and 3 were commissioned by Fox and taken in the same photoshoot in 1993.  SGD 38.  USA Weekend Magazine arranged with Fox for permission to have photographs taken of the lead actors on the set of the *X-Files* in Vancouver, and commissioned Grecco to take the photographs, including Photograph 1, in March 1995.  SGD 39.  Photograph 4 was commissioned by MCA and taken on the set of *Xena, Warrior Princess* in 1997.  SGD 40.

When Grecco took the Photographs, and for a number of years thereafter, he worked through an agent, Maggie Hamilton, who was compensated with a percentage

---

[2] The corporate Fox entity with which Grecco contracted was Twentieth Century Fox Film Corporation ("Fox"); the television show was also broadcast over the Fox network, the Fox Broadcasting Company.  The Xena photograph was commissioned by MCA Television Group ("MCA")

Joshua Koltun ATTORNEY

1   of Grecco's fees.  SGD 41.  During the 1990s, Hamilton's agency was associated with
2   the Sygma stock photographic agency and during that time she also acted as the stock
3   photography agency for Grecco.  SGD 42.

4           When an organization wished to hire Grecco to take a photograph, Hamilton
5   would negotiate the details, create a document consisting of an an estimate of what the
6   job would cost and the "usage" that was being licensed, and fax it to the Studio in
7   advance of the job.  SGD 43.  Hamilton has retired and retained no records.  SGD 44.

8           Grecco has not retained the records of these advance estimate/licenses for the
9   Photographs, only his "assignment invoices," which were documents he created after
10  the photoshoots were completed.   SGD 45.  Although Grecco relies – and historically
11  has relied -- upon his "assignment invoices" as the operative licenses, the documents
12  that he produced in this action (and previous actions)[3] are not, for the most part,
13  documents that were actually sent to the ***Studios***; rather these are invoices that Grecco
14  sent to ***Hamilton,*** after each job was completed.  SGD 46, SUF 5, Grecco Decl., ¶¶ 2,
15  11, Exh. 2, 9.

16          Hamilton, in turn, would send a ***different*** assignment invoice to the Studio.  SGD
17  47.  The "usage" language on the face of those invoices would ***not*** necessarily match
18  the language on Grecco's invoice to Hamilton.  SGD 47.  Indeed, in the one instance in
19  which Grecco has a copy of the invoice that Hamilton sent to the Studio, the language
20  on that invoice differs from the language on Grecco's invoice to Hamilton.  SGD 48.

21          By the same token, the "terms and conditions" that Grecco has produced are the
22  fine print that he ***contends*** that Hamilton was ***supposed to*** have included along with the
23  assignment invoices that she sent to the Studios.   SGD 49. Hamilton had stationary
24  printed with these terms on the back, but the fine-print would have been faxed, if
25  indeed it was included with the invoices at all.  SGD 50.

26
27  ───────────────
28  [3] *Michael Grecco Photography, Inc. v. Everett Collection, Inc.  Id.,* 589 F. Supp. 2d
    375, 379-80 (S.D.N.Y. 2008).

Joshua Koltun  ATTORNEY

Grecco attaches to this motion as the relevant "contract" for Photograph 4 certain terms and conditions.  Grecco Decl., ¶ 11, Exh. 9 (Grecco00007).  But he conceded at his F.R.C.P. 30(b)(6) deposition that these terms ***could not have been*** attached to a 1997 invoice, and contended instead that the terms that Hamilton should have attached in that year would have been the same as in 1993 and 1995 (i.e. Grecco00002, 000004). SGD 51.

In December 1994, Hamilton signed an agreement on Grecco's behalf with Fox ("1994 Agreement"). SGD 54. That agreement provided, among other things, that Grecco assigned "all right, title, and interest" in all the photographs he had taken of the *X-Files*, and agreed that Fox was "free, in its sole discretion without further compensation to you, (other than any compensation heretofore agreed to be paid to you by or on behalf of Delphi Internet Services) to utilize and exploit the [*X-Files*] Photographs worldwide, in perpetuity, in any manner it may deem appropriate, including without limitation, uses on or in connection with merchandising, commercial tie-in, advertising, promotion, and literary publishing activities arising out of or related to 'THE X-FILES' television series." *Id.*

Sometime after signing the 1994 agreement and before June 29, 1995, Grecco delivered to Fox the photographs of all three *X-Files* shoots he had taken, including the 1993 and 1995 shoots at which Photographs 1 2 and 3 were taken, and specifically including Photographs 1, 2 and 3.  SGD 55, 56.

In late 1994 or 1995, Delphi Internet Services, a corporate affiliate of Fox, advertised a promotional offer in which subscribers to Delphi would receive, among other promotional benefits, a "a database of official downloadable *X-Files* photos, video, soundtrack and program synopsis."  SGD 57.  Grecco licensed one of his photographs to Delphi for use in that advertisement.  *Id.*

In June 1995, Hamilton signed another agreement on Grecco's behalf ("1995 Agreement"), in which Fox chose fourteen photographs from among the *X-Files* photographs Grecco had taken, and Grecco "assigned all right title and interest" in

those photographs, and also agreed that Fox was "free, in its sole discretion, … to utilize and exploit the Photographs worldwide, in perpetuity, in any manner it may deem appropriate, including without limitation, uses on or in connection with the merchandising, commercial tie-in, advertising, promotion, and literary publishing activities arising out of or related to 'THE *X-FILES* television series."  SGD 58.

Although Grecco contends that Hamilton would make deals without his knowledge and approval concerning his photographs, in order to increase her commissions, he nevertheless continued to use Hamilton as his agent at all relevant times, and did not stop working through her agency until she retired in 2005.  SGD 59.

In 2017, Fox and Grecco had a legal dispute in which Fox contended that it was copyright owner of all *X-Files* promotional photographs that Grecco had taken, whereas Grecco contended that he was the copyright owner.  SGD 61.  Grecco also claimed that Fox had exceeded the scope of the licenses to the *X-Files* photographs, for example, by making "merchandising" uses of photographs beyond the fourteen in the 1995 Agreement.  *Id.*

In 2019, Fox and Grecco entered into a settlement agreement ("2019 Agreement").  Among the terms of the 2019 Agreement, the parties agreed that

- The *X-Files* Photographs that Grecco took are referred to as the "Gallery Photographs," the 14 Photographs subject to the 1995 Agreement are referred to as the "All Media Photographs," and all others as the "Remaining Gallery Photographs" ; the possibility that Fox had made use of photographs in a manner that exceeded the scope of the 1994 and 1995 Agreements was referred to as the "Questioned Uses"  [p.1]

- Neither party "disputes or repudiates" the 1994 Agreement, but the parties state that the 1994 Agreement "provides for, and only for, Fox's nonexclusive advertising and publicity use, in perpetuity, in all media now on or hereafter devised, throughout the world, of the Gallery Photographs, including the right to sublicense the Gallery Photographs for advertising and publicity purposes," [¶1] and further provided that Fox's license "permits all advertising and publicity uses, including but not limited to

retrospective advertising and publicity uses and archival advertising and publicity uses." [¶12].

- Neither party "disputes or repudiates" the 1995 Agreement, but the parties state that the 1995 Agreement "provides for an assignment by Grecco to Fox of all right, title and interest including, without limitation the copyright in and to the 14 All Media Photographs," [¶2].

- Notwithstanding Fox's ownership of the 14 All Media Photographs, "nothing herein prevents Grecco from licensing for advertising, publicity, merchandising, or other purposes, any other photographs that may bracket or be substantially similar to or even visually indistinguishable from the 14 All Media Photographs." [¶4]

- Grecco and Fox mutually released all claims against each other, including any "Questioned Uses" that commenced before the 2019 Agreement. [¶6] SGD 62.

### D. Grecco knew, and acquiesced, in the distribution by the Studios of these promotional Photographs so that any media who "came into possession" of the Photographs would be encouraged to use them in connection with editorial mention of the shows

In 1997, Grecco's counsel corresponded with Fox concerning the manner in which it distributed the *X-Files* photographs he had taken, and was informed that in the event someone "came into possession" of those photographs, the photographs "clearly state[] that the permission granted only to newspapers and periodicals to reproduce the image in question for publicity or editorial purposes in connection with [Fox] programming [and] 'must not be sold, leased, or given away.'"]   Fox also supplied him with samples of promotional photographs that Grecco had taken, which were marked with Fox's copyright.  SGD 63.  Grecco had no objection.  SGD 65.

### E. Many years after Grecco took the Photographs, he registered them with the Copyright Office – without disclosing that they were derivative works – and began his "licensing" business, which consists entirely of settling infringement claims with retroactive "licenses"

Some 8 to 24 years after taking the *X-Files* and *Xena* photographs, Grecco registered the copyrights in the Photographs.  SGD 65.  In none of his copyright registrations did he indicate that the photographs were derivative works.  *Id.*

- 8 -

Joshua Koltun ATTORNEY

Grecco has used a number of stock photographic agencies to license his work to the public, including the Sygma agency and Getty Images. SGD 66. As of about 10 years ago, Grecco was licensing his work to the public through his own website, www.mgpstockphotos.photoshelter.com. SGD 67. On that website, MGP Website, Grecco purports to license the Photographs for editorial use. SGD 68. In his claims in court, he cites his stated licensing fees for editorial use of the photographs. *Id.*

In fact, Grecco has never issued a prospective license – as distinguished from a retroactive license for a putative act of infringement – for editorial use, to any of the Photographs, through his own or any other agency, with the exception of a tiny amount of licensing revenue he received for two of the Photographs during the five years he licensed all his photographs through Getty Images. SS 69.[4]

In this litigation, Grecco has taken the position that the foregoing communications and dealings with Fox, including the 1994, 1995, and 2019 Agreements and the 1997 and 2017 correspondence, his retroactive putative "licenses," and his lack of any revenue from prospective licensing of the Photographs, are "trade secrets," and has produced them subject to the "Attorneys Eyes Only" provisions of the Court's Protective Order. SGD 71.

### F.    *Livingly used the promotional photographs in editorial comment on the underlying television shows*

Livingly is an online media company that operates the websites www.zimbio.com and www.livingly.com.   The Photographs were openly posted on those URLs in the following articles ("Articles"):

---

[4]Getty Images offered Grecco's Photographs as part of a "wholesale" license for Getty's entire database of images, the overwhelming majority of which are not promotional photographs. SGD 70. During the years that Grecco offered the Photographs for licensing via Getty Images, no one licensed Photographs 2 or 3. Total Getty revenue for Photograph 1 was $750.53, of which Grecco received $268.23; total Getty revenue for Photograph 4 was $460.25, of which Grecco received $221.45. *Id.*

Joshua Koltun ATTORNEY

- On July 19, 2016, Livingly posted the article "*Movies and TV Shows to Watch If You're Obsessed with Netflix's 'Stranger Things*," which included *The X-Files* among the recommended shows, illustrated by Photograph 1.
- On October 9, 2017, Livingly posted the article "*TV Shows All Stranger Things Fanatics Will Love*," which included *The X-Files* among the recommended shows, illustrated by Photograph 2.
- On August 5, 2017, Livingly posted the article *"15 Amazing Shows You Didn't Know You Can Watch on Hulu Now,"* which included *The X-Files* among the recommended shows, illustrated by Photograph 2.
- On January 8, 2016, Livingly posted the article "*Are You Mulder or Scully for the X-Files,"* which was illustrated with a thumbnail of a portion of Photograph 3.
- On October 18, 2018, Livingly posted the article *"Clever Halloween Costumes Inspired By Badass Females,"* which recommended *Xena, Warrior Princess* as one of the characters one could dress up as, illustrated by Photograph 4.

SGD 72.   In the custom and practice of the industry, Livingly's use of the Photographs was entirely consistent with the customary and intended use of promotional photographs in editorial content referencing the underlying shows.  SGD 73.

    None of the authors of the Articles specifically recalls where they found the Photographs on the internet, but, based on their training and Livingly's guidelines, they assume now and would have assumed at the time, that the photograph in question was a promotional photograph.  They would have assumed that the copyright in the Photograph was held by the studio, and in any event that Livingly was licensed to use the photograph in the manner in which it did.  Nevertheless, if the photograph had carried a copyright notice from Grecco or any other professional photographer, they would not have used the photograph.  SGD 74.

### G.   Grecco has for many years conducted reverse image searches for uses of the Photographs, and does not know when his agents first discovered Livingly's use of the Photographs

    The four Photographs are among the "classic" images that Grecco frequently sues over, or threatens to sue over.  SGD 76.   Until 2018, Grecco used a reverse image search vendor called ImageRights to search for infringement of his photographs.  SGD 77.  Grecco does not know whether ImageRights discovered the use by Livingly of any

of the Photographs.  SGD 78.  At some point, Grecco also began to use an image-searching service provided by his law firm, Higbee & Associates, which itself relies on vendors to perform the actual searches.  SGD 79.  Higbee & Associates performs evaluations of the viability of legal claims and then sends cease and desist correspondence to putative infringers, including Livingly, as explained below.  *Id.*

### H.   When Grecco sent it cease and desist letters, Livingly promptly took down the Photographs and replaced them with screenshots

In November 2018, Grecco (acting directly, not through counsel), sent Livingly a cease and desist letter based on a use by Livingly of Photograph 1 that is not at issue in this case.  SGD 80.  Livingly promptly removed that use of the photograph, and also performed a search to locate any other uses of *X-Files* photographs (whether or not Livingly had information that they were by Grecco).  SGD 81.  Livingly replaced every still photograph of *X-Files* that it found on its websites with a screenshot taken from actual footage of the television show.  SGD 82.  However, because of technical limitations on its ability to search content on its websites, Livingly inadvertently overlooked uses of still photographs at issue in this case.  SGD 83.

In February and April, 2019, Higbee and Associates sent two cease and desist letters concerning the four Photographs, as well as, mistakenly, a different photograph that Livingly was not using. SGD 84.   Livingly promptly removed the uses of the photographs it had failed to detect earlier. *Id.*   On January 6, 2020, Grecco filed the instant lawsuit. D.E.1.

### ARGUMENT

### I.   The Photographs were expressly created for the purpose of promoting the X-Files and Xena, Warrior Princess shows in the media; Livingly's use was within the scope of the license to do so

### A.   The Photographs were derivative works of the copyrighted television shows; any rights Grecco has in the Photographs are subject to the studio's promotional purpose in permitting the creation of the Photographs

The fundamental error of this motion is the premise that if Grecco has a valid copyright in his Photographs, he has an unrestricted right to exploit them.

The Photographs were promotional photographs; the Studios permitted Grecco to create them in order to promote their respective television shows.  SGD 20, 27.  The Photographs depict the principal characters in the *X-Files*, Mulder and Scully, and Xena, the titular character of *Xena, Warrior Princess*.  SGD 21.

As such, the Photographs are "derivative works" of the primary works owned by the Studios.  17 U.S.C. § 101.  Where "it is uncontroverted that the characters [in work B] were lifted lock, stock, and barrel" from copyrighted work A, work B is a "derivative work" of work A.  *Anderson v. Stallone*, 1989 U.S. Dist. LEXIS 11109, at *24-25 (C.D. Cal. Apr. 25, 1989).[5]

Thus, although Grecco may own the copyright in the Photographs, this does not give him unrestricted ownership rights, because the rights of an owner of a derivative work are always subject to the rights of the owner of the underlying work from which it is derived.  *Stewart v. Abend*, 495 U.S. 207, 221-36 (1990).   If the creator of a derivative work has no authority from the owner of the underlying work to create that derivative work, the derivative work is infringing.  *Anderson*, 1989 U.S. Dist. LEXIS 11109 at *25.  If the copyright holder had authorized the creation of the derivative work, that derivative work is not infringing, but the derivative work's owner's right "may not exceed the specific purpose for which permission was granted."  *Gilliam v. ABC*, 538 F.2d 14, 20-21 (2d Cir. 1976).  Thus a photographer who takes a photograph of a sculpture at the behest of the sculptor is not infringing the sculptor's copyright, but "that does not mean that [the photographer's] copyrights in the photographs give him the unrestricted right to use and license them as he wishes without regard to [the

---

[5] *See also Toho Co., Ltd. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1215-16 (C.D. Cal. 1998) (studio that owns Godzilla character owns publicity stills depicting Godzilla); *Wendt v. Host Int'l, Inc.*, 197 F.3d 1284, 1286 (9th Cir. 1999) (Kozinski, J. dissenting from denial of en banc review in right-of-publicity case) ("The presentation of the robots [that replicate characters] in the *Cheers* bars is a [copyright] derivative work, just like a TV clip, promotion, photograph, poster, sequel or dramatic rendering of an episode.")

Joshua Koltun ATTORNEY

sculptor's] copyrights in the sculptures those photographs depict." *Cooley v. Penguin Grp. (USA), Inc.*, 31 F. Supp. 3d 599, 608 (S.D.N.Y. 2014).

Indeed, in that case, since the photographer's "original contributions to the photographs are inextricably intertwined with …[the] sculptures, [the photographer's] ability to exploit his own rights to the photographs without [the sculptor's] consent is virtually nonexistent." Arguably that is the case here, but the Court need not decide that to dispose of the case.[6]  Assuming Grecco retained any residual right to exploit the Photographs, his rights would not extend to interfering with the promotional purpose for which the photographs were created. *Gilliam*, 538 F.2d at 20-21; SGD 37.

### B.   Grecco has the burden to show Livingly exceeded the scope of the promotional license to these photographs

A key question presented by this case is the scope of this promotional license. Livingly contends, and has presented expert testimony, that the understanding in the industry is that the studios would distribute promotional photographs as widely as possible to maximize publicity, in the hope and expectation that any media that came into possession of the photographs would use the photograph in editorial content discussing the show. SGD 27-35. Grecco's motion is conspicuously silent as to the promotional purpose for which these Photographs were created, or the true ("trade secret") facts concerning the contractual arrangements regarding these photographs.

Although the defendant has the burden of showing the existence of a license, the plaintiff has the burden of showing that the scope of the license was exceeded. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 630-31 (2d Cir. 1995). Plaintiff has the burden to prove a limitation on the licensee's right to sublicense. *Smith v. Barnesandnoble.com, LLC*, 839 F.3d 163, 166-68 (2d Cir. 2016) (promotional license); *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 38-41 (2d Cir. 2019).

---

[6] By the same token, Grecco's failure to disclose in his copyright registration that the works were derivative is a proper basis for the affirmative defense of fraud on the copyright office. SGD 65; F.A. Answer (DE 16), 11th Affirmative Defense.

Joshua Koltun ATTORNEY

### C. *Quite apart from the promotional nature of these derivative works, Grecco expressly and impliedly licensed the media to use the photographs in editorial comment on the underlying shows*

As explained above, Grecco's copyrights in these Photographs are, as a matter of law, subject to the Studio's purpose in allowing them to be created, which was to maximize their editorial use by the media. But quite apart from derivative nature of the Photographs, Grecco expressly and impliedly licensed that promotional use of the Photographs. Where the copyright holder "created a work at [another's] request and handed it over, intending that defendant copy and distribute it," he impliedly licenses that person to use the copyrighted work in the intended manner. *Effects Assocs. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990). "[W]here a licensor grants to a licensee the unrestricted right to sublicense and permit others to use a copyrighted work, a sublicense may be implied by the conduct of the sublicensor and sublicensee." *Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56, 64 (1st Cir. 2020). A nonexclusive license can be shown by "nonwritten evidence--such as testimony, course of conduct, and custom and practice." *Foad Consulting Grp., Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 825-28 (9th Cir. 2001).

Here, Grecco both impliedly and expressly licensed the Studios to disseminate these promotional photographs to the media. SGD 41-60; 62-64. The custom and practice in the industry indicated that promotional (or "publicity") photographs would be disseminated widely in the media so that the media would use them in editorial comment on the shows. SGD 27-35.[7] Grecco knew that Studios were distributing these photographs to the media, and specifically knew that the permission to use his photographs to illustrate editorial material concerning the shows extended to any media

---

[7]*Ermolieff v. R. K. O. Radio Pictures*, 19 Cal. 2d 543, 549-50 (1942)(entertainment industry custom is a part of the contract in aid of its correct interpretation"); *Howard Entm't, Inc. v. Kudrow*, 208 Cal. App. 4th 1102, 1114 (2012)(same);*Watson Land Co. v. Rio Grande Oil Co.*, 61 Cal. App. 2d 269, 271-72, 142 P.2d 950, 951-52 (1943) (anyone engaged in an industry is deemed aware of practices of common knowledge)).

Joshua Koltun ATTORNEY

that "came into possession" of the photographs, and had no objection.  SGD 63, 64.
Indeed, he had not objection to the Studio marking the Photographs with their own
copyright notice.  *Id.*[8]

Livingly's editorial use of these promotional Photographs squarely falls within
the intended use of these photographs.  *See Viacom Int'l v. Tandem Prods.*, 368 F.
Supp. 1264, 1275 (S.D.N.Y. 1974) (a license will be construed as including such rights
as the licensor knows the licensee believes it has); *Settel v. Office Appliance Co.*, 1959
U.S. Dist. LEXIS 4260, at *4-6, 8-9 (N.D. Ill. June 15, 1959) (license to publish article
in magazine implied right to reprint the articles in booklet).[9]  SS 63, 64, 73.

Grecco's license – like all copyright licenses - contained the implicit requirement
that he "do nothing whatsoever that would injure or destroy the value" of the license he
had granted to the studios. *County of Ventura v. Blackburn*, 362 F.2d 515, 518 (9th Cir.

---

[8]Insofar as there is any suggestion by Grecco that the promotional license
requires the licensee to show some direct chain-of-custody and/or express license
agreement between the Studio and the particular media outlet, he has provided no
evidence to support such limitation.  That Fox at present only puts on its press website
press kits for its current shows is not an indication that it has withdrawn permission to
use promotional photographs for older shows.  SGD 19.

[9]Grecco's contemporaneous knowledge and conduct is relevant because this
Court must determine the intentions of the parties, which is an objective test. *Wind
Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 68-69
(2017).  Grecco's "undisclosed intent or understanding is irrelevant" to interpreting his
license. *Founding Members of the Newport Beach Country Club v. Newport Beach
Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003).  The parties' course of
performance immediately after executing the contract is evidence of the parties'
intentions. *Wind Dancer,* 10 Cal.App.5th at 72; Cal. Civil Code § 1647; Restatement
of Contracts 2d  § 202(4).  Even if it were true that Grecco harbored any undisclosed
belief that his license did not allow such use, his failure to act on that belief is what
matters legally. *Oceanside 84, Ltd. v. Fid. Fed. Bank*, 56 Cal. App. 4th 1441, 1449-51
(1997) (contemporary acquiescence is evidence of parties' intentions).; *S. Cal. Edison
Co. v. Superior Court*, 37 Cal.App.4th 839, 851 (1995) (conduct of one party to the
contract is evidence of both parties' intentions) *See also* Civil Code  § 1649 (contract
will be interpreted in the sense that promisor believed, at the time, that promisee
understood the contract).

Joshua Koltun  ATTORNEY

1966). A license cannot be reasonably construed as granting the licensor the "unreasonable advantage" of later allowing the licensor to "destroy the fruits of the agreement." *Zim v. W. Publ'g Co.*, 573 F.2d 1318, 1324-25 (5th Cir. 1978); *accord Budco, Inc. v. The Big Fights, Inc.*, 594 F.2d 900, 902 (2d Cir. 1979); SGD 37 (expert opinion that Grecco's lawsuits undermine the entertainment industry's ability to promote their shows through promotional photographs).

### D. Grecco's "assignment invoices" neither negate nor limit the scope of the license to the media to use the promotional photographs

Grecco claims here, as he has claimed historically,[10] that he licensed his Photographs – or at least two of them – via his "assignment invoices," which he calls "contracts."  SUF 2, Grecco Declaration ¶¶ 2, 9, Exh. 2 and 11.  His contentions are somewhat murky as to Photographs 2 and 3, as to which he does not mention any "contracts," presumably because he does not want to publicly acknowledge the ["trade secret"] 1994 or 2019 Agreements.  But the 2019 Agreement governs all of his X-files photographs, as to which he granted a publicity license "retrospectively" and "in perpetuity." SGD 62.

Thus the "assignment invoices" are relevant, at most, only to the Photograph 4, the Xena photograph.  But Grecco's reliance on that "assignment invoice" is misplaced.

First, these "assignment invoices" were ***not*** invoices to the studios – as represented in the *Everett* case -- but rather Grecco's invoices to his agent, Ms.

---

[10] That unchallenged factual representation was the basis of the Court's opinion in *Michael Grecco Photography, Inc. v. Everett Collection, Inc.,* 589 F. Supp. 2d 375, 379-80 (S.D.N.Y. 2008).  That case involved a stock photography company purporting to license Grecco's photographs for a fee.  *Id.* at 377-78.  It did not involve the media using promotional photographs to illustrate editorial comment on the shows.  The question of the scope of the promotional license was thus never presented.  Moreover the photographs at issue in that case were not all promotional photographs. Nevertheless, and significantly, the Court held that there was a question of fact whether Grecco had granted an exclusive license to the studios, reserving for himself only the right to use the photographs to promote his own photography business.  *Id.,* at 383-84; *compare* Grecco Decl., Exh. 9.

Joshua Koltun   ATTORNEY

Hamilton.  SGD 46.   Hamilton did not necessarily use the language on the face of her invoices to the studios that Grecco used in his invoices to her.  SGD 47, 48.  Moreover, there is no admissible evidence as to whether Hamilton's staff actually included the boilerplate fine print on the back of the invoice when they faxed her invoices to the studios.  SGD 49.  Assuming they did so, it is not at all clear that the fine print would have been legible.  SGD 50.

Assuming *arguendo* that the fine print was sent and was legible, it would not negate the general promotional license to the photographs.  The assignment invoice would only have been sent to MCA after it had commissioned the photographs and set aside valuable time to have its lead actress photographed on set.  As then-Judge Sotomayor explained in an analogous circumstance, a software company that allows people to download its software cannot enforce the purported "terms" of a software license unless it can show that a "reasonably prudent" person would have known or learned of the existence of the terms before responding to the invitation to download the software; the bare act of downloading the software cannot be deemed to manifest assent to the terms of the license.  *Specht v. Netscape Communs. Corp.*, 306 F.3d 17, 20-21, 28-30 (2d Cir. 2002) (applying California contract law); *accord Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1175-77 (9th Cir. 2014).

Any purported inclusion of these fine-print terms on after-the-fact invoices cannot have negated MCA's understanding that it had commissioned promotional photographs precisely so that they would be widely disseminated to the media to maximize publicity for the show.   Indeed, the invoice language on which Grecco relies here is far broader than promotional: "***unlimited usage rights*** are granted to the client." SGD 52 (emphasis added).[11]

There was no indication that this very broad grant of rights would be negated by fine print "terms and conditions."  Indeed, it is impossible to reconcile the "terms and

---

[11] Indeed, MCA used the photograph, among other things, as a cover for a boxed set of DVDs for the Xena series.  SS 17.

conditions" with the promotional nature of these photographs.   For example, paragraph 3 states:

> **Scope of License:**  Rights are granted for **one use only (excluding buy outs).**
> … Materials may not be reproduced, copied, projected, cannibalized or otherwise used without express written consent.

SGD 53.  But it is in the very nature of a promotional license – let alone an "unlimited usage" license -- that the photograph will be "reproduced," among other things, in press kits, and widely disseminated to the media, who would themselves be expected to reproduce the photographs in their editorial content.  Assuming MCA were aware of the putative "terms and conditions" fine print, it would have been justified in assuming that this boilerplate language only applied to "editorial" licenses, not to an expressly "unlimited" license. [12]  *Cf. Live Face on Web, LLC v. Cremation Soc'y of Ill., Inc.*, 2019 U.S. Dist. LEXIS 82660, at *2-3, *10-12 (E.D. Pa. May 16, 2019) (terms of end-user license agreement that contradicted consumer expectations and understandings by restricting software use to "one URL" supported claim of violation of California Unfair Competition Law).

The "assignment invoice" to Photograph 4 thus cannot negate Grecco's contemporaneous conduct, which shows that he fully understood and acquiesced in the general custom and practice of distributing promotional photographs  to the media to maximize publicity to promote their shows.  *Foad Consulting Grp.* 270 F.3d 821 at 28.

## II.   *Livingly's use of the promotional Photographs in editorial comment on the underlying television shows was fair use*

Grecco contends that the license to the media to use promotional photographs in connection with the underlying shows is limited.  For example, he contends that the studios only had the right to send the photographs to "credible approved editorial

---

[12] The terms and conditions that Grecco contends were sent by Hamilton in 1993 to 1997 were the same, whether the use was for a single editorial use, as by USA Weekend or a single advertising use, as by Delphi Internet, or a publicity use, as for photographs 2, 3, or 4.  SGD 51.

Joshua Koltun   ATTORNEY

outlets," and that the studio publicity departments "more or less had to approve the content of [an] article … before it was published"[13]  Assuming, *arguendo*, that Grecco were able to support any such contentions with evidence of the custom and practice in the industry, Livingly's use was fair use.

The fair use analysis requires the Court to apply an "equitable rule of reason." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 447-50 (1984).  "The fair use doctrine thus 'permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994) (internal citation omitted)).  The Copyright Act lists four statutory fair use factors (discussed below), but they are "illustrative and not limitative," and should not be "treated in isolation, one from another," but rather "[a]ll are to be explored, and the results weighed together, in light of the purposes of copyright." *Id.* at 577-78.

### A.    The *"purpose and character"* of Livingly's use of the photograph, to illustrate editorial comment on the underlying television shows – strongly favors a determination of fair use

The first factor requires the Court to consider the "purpose and character" of Livingly's use of the photographs.  17 U.S.C. § 107. The copyright statute singles out for protection "purposes such as criticism, comment, [and] news reporting."  *Id.* Assuming *arguendo* that the license was limited to "friendly" media or "favorable" comment, the fair use doctrine would abrogate any such limitations.  Thus, for example, in *Dhillon v. Doe*, a politician had commissioned a photograph of herself in order to use in her campaign, and owned the copyright in the photograph.  *Id.,* 2014 U.S. Dist. LEXIS 24676, at *13-15 (N.D. Cal.).  Defendant, without a license from the politician, had used the photograph in article that criticized her.  *Id.*  "Such a use is precisely what the Copyright Act envisions as a paradigmatic fair use." *Id.* at *15.  Similarly, where a magazine had run a satirical scatological article ridiculing a

---

[13] Depo. (Koltun Decl., Exh. A) 149:1-9, 183:4-20.

Joshua Koltun ATTORNEY

prominent pastor/political figure, it was fair use for the pastor to use copies of the article in fundraising efforts for his political organization. *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1153 (9th Cir. 1986).

Contrary to Grecco, the fact that Livingly's Articles generate advertising revenue is of little significance to the analysis of the first factor here. In *Hustler Magazine,* the defendant was making direct use of the copyrighted work to raise funds. *Id., see also Campbell*, 510 U.S. at 594 ("[i]t was error for the Court of Appeals to conclude that the commercial nature of [defendant's work] rendered it presumptively unfair"). "[A]lmost all newspapers, books and magazines are published by commercial enterprises that seek a profit," but that is of little significance where "the link between [the defendant]'s commercial gain and its copying is . . . attenuated" *Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir. 2014) (internal citation omitted). The first factor strongly favors fair use.

> **B.    Since the promotional Photographs are derivative of the Studio's television shows and specifically created to be published by the media, the "nature of the copyrighted work" favors fair use**

The second factor requires the court to consider "the nature of the copyrighted work." 17 U.S.C. § 107. Some works, such as fictional, creative works, are closer to the core of intended copyright protection than primarily factual works. *Campbell*, 510 U.S. at 586. Photographs that depict factual events are more conducive to fair use than photographs that "comprise the photographer's artistic product." *Elvis Presley Enters. v. Passport Video*, 349 F.3d 622, 629-30 (9th Cir. 2003).

Here, as discussed in section I.A., the Photographs are derivative works, depicting fictional characters in a television show, the copyright to which is owned by the Studio. Thus, while the Photograph is, in that sense, "creative," the fictional characters at issue are not Grecco's creation. Thus, even if we assume that Grecco added some element of originality to the photograph (as does a photographer of factual events), one cannot attribute to Grecco the creativity that was involved in creating the underlying television show and the characters depicted in the photograph.

Joshua Koltun ATTORNEY

- 20 -

1    Moreover, one must also consider the promotional nature of the copyrighted

2    works here.  Where a work is created with the intention that it be disseminated and

3    used, that counsels in favor of a finding of fair use.  *Am. Inst. of Architects v. Fenichel*,

4    41 F. Supp. 146, 147 (S.D.N.Y. 1941).[14]  The second factor favors fair use.

5    **C.    Since the "amount and substantiality of the portion" of the work that Livingly used was appropriate to the purpose for which Livingly did so, this factor favors fair use.**

6

7    The third factor requires the Court to consider the "the amount and substantiality

8    of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107.

9    This is not a quantitative inquiry, but rather is aimed at determining whether the

10   amount taken was "reasonable in relation to the purpose of the copying."  *Campbell*,

11   510 U.S. at 586-88.  Thus, for example, it may be permissible to take the "heart" of a

12   copyrighted work if to do so is necessary for the purpose of parodying the work.  *Id.*

13   Depending on the nature of the use, the wholesale copying of the entire work may be

14   consistent with fair use.  *Sony Corp.* 464 U.S.at 449-50.

15   Here, in light of the promotional nature of the Photographs, the portion of the

16   photographs that Livingly used to illustrate its comment on the underlying television

17   shows was entirely reasonable.[15]  The third factor favors fair use.

18   **D.    Grecco cannot rely on circular reasoning to create an imaginary market for editorial licenses to these promotional photographs; thus the "effect of the use upon the potential market" favors fair use.**

19

20   The fourth factor requires the Court to consider "the effect of the use upon the

21   potential market for or value of the copyrighted work."  17 U.S.C. § 107.  The market

22   analysis "requires a balancing of the benefit the public will derive if the use is

23   permitted and the personal gain the copyright owner will receive if the use is

24   _____

25   [14] By contrast, where a work has never been published, that counsels against fair use. *Harper & Row v. Nation Enters.* 471 U.S. 539, 550-51 (1985).

26   [15]It is true that Livingly did not credit Grecco, MSJ at 12:19, but there is no evidence

27   that Livingly was aware that he was the photographer or that he claimed copyright.

     Grecco's (unsupported) contention that Livingly used the entirety of the Photographs

28   (MSJ at 12:18) is not correct as to Photograph 1 or 3. SGD 72.)

Joshua Koltun ATTORNEY

Joshua Koltun   ATTORNEY

1   denied." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir.

2   2006) (internal citation and quotation marks omitted).   Here, the purpose of

3   promotional photographs is to benefit the market for the underlying television shows,

4   not to create a market for the photographs themselves.   The Studios permitted the

5   creation of the photographs precisely so that they would be disseminated to the media

6   without charge, so that the media use would promote the shows.   SGD 27-31.

7        The fourth factor does not mean that the copyright holder can defeat fair use

8   simply by positing a desire to license the use at issue.   It "is a given in every fair use

9   case that plaintiff suffers a loss of a potential market if that potential is defined as the

10   theoretical market for licensing the very use at bar."   *Id.* at 614 (quoting 4 Melville B.

11   Nimmer & David Nimmer, Nimmer on Copyright § 13.05[A][4] (2005)).   The

12   copyright owner must show that there are "traditional, reasonable, or likely to be

13   developed markets" that would be impaired by the use.   *Id.*

14        Even if we assume that Grecco retained some residual right to exploit the

15   photographs, that doesn't mean that he can posit an imaginary market whereby media

16   commenting on television shows must pay a fee to license promotional photographs to

17   illustrate these articles.   *Id.* at 615 (copyright holder cannot preempt fair use by

18   claiming to have developed a market for licensing "parody" or "news reporting").

19        Grecco claims to rely on "licensing" the Photographs "for uses such as those at

20   bar."   MSJ at 12:20:21. But his "licensing" business consists entirely of settlements of

21   litigation or threatened litigation.   SGD 69.   Indeed, Grecco has designated his dealings

22   with Fox to be a "trade secrets;" disclosure of the true facts concerning the promotional

23   licenses to these Photographs would damage his ability to extract nuisance settlements.

24   SGD 71.   To deem that litigation business to constitute a "market" for fair use

25   purposes would be precisely the circular reasoning that the law forbids.[16]   The fourth

26   factor favors a finding of fair use.

27

28        [16] *Cf. Philpot v. L.M. Communs. II of S.C.*, 2020 U.S. Dist. LEXIS 85901, at *6
     (E.D. Ky. May 15, 2020) (where successful copyright plaintiff was in the business of

- 22 -

**III.   Grecco's claims regarding Photographs 1 and 3 are time-barred, because Livingly's articles were openly available on the internet for more than three years; Grecco has not shown when he first discovered them, let alone that he could not reasonably could have discovered them earlier**

Livingly openly published the Articles containing Photographs 1 and 3 on its website more than three years before Grecco filed suit.  SGD, 72.  Grecco contends that the statute of limitations is tolled, on the assumption that the the discovery rule of *Polar Bear Prods., Inc. v. Timex Corp.* remains good law, which is far from certain. [17] *Id.,* 384 F.3d 700, 706-07 (9th Cir. 2004).  MSJ at 13 5-23.  In any event he has not made a showing under that rule, which is that plaintiff must thus show, first, that he had not discovered the infringement, and second, that his failure to do so was reasonable "under the circumstances."  *Id.*  The burden is on the plaintiff to show tolling. *Hinton v. Nmi Pac. Enters.*, 5 F.3d 391, 395 (9th Cir. 1993).

Grecco states that he first learned of Livingly's use of the Photographs on December 24, 2019.  MSJ, at 13:24.  This is obviously false.  His lawyers sent Livingly a cease and desist letter regarding these articles in February and April, 2019, and

---

litigation and obtaining nuisance settlements, which he characterized as "licenses," rather than genuinely licensing his work, attorneys fees were not awarded because they would not serve the interests of the copyright law).

[17] In *Mangum v. Action Collection Service*, the Ninth Circuit acknowledged that the Supreme Court has cast considerable doubt on its general application of a discovery rule to federal statutes, but indicated that it would continue, in the absence of a clear directive from the Supreme Court.  *Id.*, 575 F.3d 935, 941 (9th Cir. 2009). Subsequently, however, in *Rotkiske v. Klemm*, the Supreme Court specifically disapproved *Magnum*, holding that discovery rules were not the general default for federal statutes, and that between two plausible constructions the "standard rule" is that the limitation runs from the time the cause of action accrues.  *Id.* 140 S. Ct. 355, 359-360 (2019).  Similarly, in *Gabelli v. SEC*, the Court held that "the standard rule is that a claim accrues when the plaintiff has a complete and present cause of action."  *Id.*, 568 U.S. 442, 448 (2013)(citations and quotation marks omitted).  Interpreting the SEC statute, which, like the Copyright statute, required actions to be commenced within [a specified time] from the date when the claim first accrued," the Supreme Court concluded that the discovery rule would only apply where a showing was made of fraudulent concealment.  *Id.* at 445, 447-51; *compare* 17 U.S.C. § 507(b) ("No civil action shall be maintained [under Copyright Act] unless it is commenced within three years after the claim accrued.").  There is certainly no evidence of fraudulent concealment here.

- 23 -

Grecco concedes that Livingly took the Photographs down in response.  SUF 1, SGD 81-84.  Grecco has presented no evidence as to when his lawyers – or the vendors he and his lawyers used to locate uses of his photographs -- first discovered Livingly's Articles.  *See also* SGD 78.  Moreover, even if it were the case that his vendors/attorneys had not learned of the Articles until less than three years before filing, he presented no evidence that that they could not reasonably have done so.  For purposes of the discovery rule, the knowledge of his agents and the reasonableness of their conduct is imputed to Grecco.  *See, e.g., Miniace v. Pac. Mar. Ass'n*, 2006 U.S. Dist. LEXIS 13726, at *8 (N.D. Cal., May 18); Restatement 2d of Agency § 277. Those claims are time-barred.

**IV.   If Livingly were liable for infringement, it was not reckless – indeed, not even negligent – in assuming that it was permissible to use these promotional Photographs to illustrate editorial mention of the shows they depicted**

As soon as Livingly learned that Grecco was asserting claims to **one** X-Files photograph, it removed **all** photographs of the *X-Files* that it could find, replacing them with screenshots from the actual show.  SGD 81, 82.  Livingly inadvertently failed to discover certain uses, but removed them as soon as Grecco brought them to its attention.  SGD 83.

Under these circumstances, Livingly's infringement of the Photographs cannot be deemed willful.  Grecco's contention of willfulness is based on the premise that Livingly's staff were mistaken in thinking that the Photographs "appeared" to be promotional.  MSJ at 2:25-28, 3:12-13.  But they were not mistaken.  The photographs were promotional, and Livingly's staff were entirely justified in believing that they were therefore entitled to use the Photographs as they did.  SGD 74.  It was natural for them to have assumed that such promotional photographs were owned by the studios, or in any event, given the custom and practice in the industry, that the media were licensed to use promotional photographs to promote the shows they depicted.  SGD 27-35.

1  Certainly the media should not be expected, as Grecco insists, to research the

2  precise contractual arrangements underlying each self-evidently promotional

3  photograph, particularly since, here, the true contractual arrangements with the studios

4  have been deliberately kept secret.[18]  SGD 71.  Grecco has not shown that Livingly's

5  staff were negligent, let alone reckless.

### CONCLUSION

6

7  This entire motion is based on the premise that Grecco's copyright in these

8  derivative promotional photographs gives him unrestricted right to sue the media for

9  using these photographs in the intended manner.  Because that premise is erroneous as

10  a matter of law, this motion should fail.  As explained in Livingly's motion for

11  summary judgment, on the foregoing facts, Livingly is entitled to summary judgment.

12  At a minimum, however, the foregoing evidence is sufficient to raise a triable issue of

13  fact, and Livingly respectfully urges that this motion be denied.

14  Dated:  March 15, 2021

15  _____\s_____

16  Joshua Koltun
   Attorney for Defendant and
   Counterclaimant Livingly Media, Inc.

17

18

19

20

21

22

23

24
   _____

25  [18] Grecco testified that even though Fox had labeled his promotional photographs with
   its own copyright notice, it would not be reasonable for the media to believe that Fox

26  actually owned the copyrights, "because … anyone sophisticated enough would realize
   that you couldn't count on the specific deal or details of any arrangement between an

27  artist and the network without knowing them, but that a network like Fox stamped
   everything 'Copyright Fox.'  Depo. (Koltun Decl., Exh. A) at 185:10-186:17.

28

Joshua Koltun ATTORNEY